[No. F058350. Fifth Dist. Feb. 22, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
EDDIE ALFONSO BROWN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the part entitled "Additional Facts" and parts II., III., IV., V., VI., VII., and VIII.

**COUNSEL**

Linda M. Leavitt, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Lloyd G. Carter and Leanne LeMon, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**POOCHIGIAN, J.—**

## INTRODUCTION

Appellant/defendant Eddie Alfonso Brown (defendant) was charged with and convicted of first degree murder (Pen. Code, § 187, subd. (a)) in the homicide of his former girlfriend, Bridget Colmore (Bridget).[1] Bridget disappeared on September 11, 2001. She was last seen entering defendant's apartment. Her body was found one month later, buried in a cornfield. Defendant admitted to his half sister that he strangled Bridget, but claimed he had to defend himself because she attacked him with a hammer. At trial,

---

[1] We will refer to the victim and several witnesses by their first names for clarity and ease of reference; no disrespect is intended.

defendant again claimed Bridget attacked him with a hammer, but asserted that she died accidentally when he pushed her away and she flipped over a couch.

During trial, the superior court granted the prosecution's motion to introduce evidence about the prior acts of domestic violence that defendant committed against Bridget and against four other girlfriends in the years prior to his relationship with Bridget. In so ruling, the court relied on Evidence Code[2] section 1109, subdivision (a)(1), which states that "in a criminal action in which the defendant is accused *of an offense involving domestic violence*, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (Italics added.) The court found that the instant murder prosecution was for an "offense involving domestic violence" within the meaning of section 1109. The court also made extensive findings that the evidence was more probative than prejudicial under section 352.

In the published portion of this opinion, we conclude the superior court properly admitted defendant's prior acts of domestic violence under section 1109, and we agree with the court's observation that "murder is the ultimate form of domestic violence" under the facts and circumstances of this case. In the nonpublished portion of this opinion, we reject defendant's other evidentiary and instructional contentions, and his arguments about alleged prosecutorial misconduct. We will affirm.

## FACTUAL SUMMARY

As of 2001, Bridget had dated defendant for two years. She was a petite woman and weighed about 112 pounds. Defendant was five feet nine inches tall, and weighed 195 pounds. Defendant had two years of training in tae kwon do, and his family and friends knew he was into martial arts. He had a felony conviction for selling drugs in 1998.

At some point between November 2000 and March 2001, Bridget told her coworker, Margarita Ibarra, about an argument she had had the prior evening with her boyfriend, "Eddie." Bridget told Ibarra that "Eddie" choked her during the argument, and she demonstrated how "Eddie" put his hands around her neck. Bridget said her neck still hurt and Ibarra could see discoloration on her neck. Bridget said she could not believe that "Eddie" put his hands on her. Bridget said that as he choked her, she told him to leave her alone, and she either kicked or pushed him away.

---

[2] All further statutory references are to the Evidence Code unless otherwise indicated.

Around July 2001, Bridget and defendant were in the mall together. George Ybarra, who previously dated Bridget, was walking nearby and saw the couple. Ybarra smiled at Bridget and tried to greet her, but Bridget shook her head and looked very uncomfortable. A few days later, Bridget told Ybarra that she could not say hello to him because " 'it would have been harmful for me and possibly for you.' "

During the summer of 2001, Bridget told Margarita Ibarra that she was no longer seeing "Eddie." Bridget's family believed they broke up a few months before she disappeared. However, defendant kept calling her home telephone and cell phone, and members of her family testified that she tried to screen her calls to avoid speaking with him.

In July or August 2001, Bridget met Patrick McKinnie and they started dating. Shortly before Bridget disappeared, McKinnie was spending the weekend at Bridget's house when defendant unexpectedly arrived. Bridget and McKinnie were outside; defendant walked up to Bridget, and she told McKinnie that defendant was " 'Eddie,' " her former boyfriend. Defendant told Bridget that he needed to talk to her. Defendant said, " 'What is this[?] What is this[?]' " McKinnie asked what the problem was. Defendant replied, " 'You know what the problem is.' " McKinnie said he did not know. Bridget told defendant she was going to call the police, and defendant left. When McKinnie drove away from her house the next day, defendant drove very close behind and then alongside McKinnie's car, and motioned for McKinnie to pull over. McKinnie ignored defendant and drove past him.

A few weeks before her death, Bridget spoke to another former boyfriend, Jesse Gutierrez. Bridget was concerned and said defendant threatened her life because she broke off their relationship. Bridget said that defendant said he was going to kill her and whoever was with her.

About a week before she disappeared, Bridget drove her children to a restaurant for dinner, and her young son noticed that defendant was following them in his car.

On the afternoon of September 10, 2001, Bridget was at her mother's house when defendant called her cell phone about four times. Bridget's mother answered three of the calls, and each time she "cursed [defendant] out and said that Bridget is through or Bridget is done or she doesn't want you. Leave her alone." Bridget's mother testified defendant kept calling back, and Bridget finally answered the fourth call and spoke to defendant.

Around 5:00 p.m. on September 10, 2001, Bridget called George Ybarra. She said she had met a new man and she was excited about their relationship. Ybarra had recently seen Bridget with defendant, and he asked why she was still dating defendant because that relationship was not healthy. Bridget said she had to go to defendant's house that evening and pick up some things. Ybarra urged Bridget not to go, but advised her to take her sister if she did.

*Bridget's disappearance*

Around 5:00 p.m. on September 11, 2001, Bridget received a call while she was cooking dinner for her family at her Visalia home. Her 14-year-old niece heard Bridget refer to the caller as "Eddie," and say, " 'Eddie, what do you want[?]' " Bridget was upset but she stayed on the telephone, went into her bedroom, and closed the door.

When Bridget emerged from the bedroom, she was very upset. She told her niece to finish cooking dinner and said she would be right back. Bridget walked out of her house and her family never saw her again. It was daylight when she left.

Bridget was later seen walking into defendant's Visalia apartment, just before it was dark. Her car was parked in front of his apartment. Defendant's neighbors recognized Bridget and her car from her prior visits. Defendant's neighbors shared a common wall with defendant's apartment, and they never heard any sounds of a disturbance that night. Sometime after 10:00 p.m., one of defendant's neighbors realized that Bridget's car was no longer parked at the curb.

Bridget was never seen alive again, and her car could not be found. Bridget's niece, who lived with the family, testified defendant never again called the house after Bridget disappeared.

*The investigation*

On September 13, 2001, investigators from the Tulare County Sheriff's Department interviewed defendant and asked if he knew of Bridget's whereabouts. Defendant said she had briefly stopped by his apartment around 6:00 p.m. on September 11, 2001, but she left and he had no idea where she was. An officer asked defendant if he had called Bridget and asked her to come over. Defendant said he did not recall. The officer asked if he called Bridget at any time on September 11, 2001, and defendant said he might have done so.

Defendant had a fresh bruise above his right eye. Defendant said he received the bruise a few weeks earlier during a fight at a gas station. Defendant's head was shaved and he did not have any other injuries. At the officer's request, defendant removed his shirt, and the officer did not see any injuries on his upper body. Defendant did not say anything about Bridget inflicting any injuries on him.

At a later point in the investigation, defendant called the officers and complained that they were following him. He also told the officers that he was just as concerned about Bridget as they were.

*Marilyn Davis's statement*

Marilyn Brown Davis, defendant's half sister, initially told officers that she did not have any information about Bridget's disappearance. As the investigation continued, however, Davis contacted investigators and disclosed information about defendant's activities on the night of September 11, 2001. Davis said she was driving on Highway 99 when defendant called her, drove beside her car, and asked her to follow him. Davis followed defendant as he drove a car from Visalia to Fresno and left it in a parking lot. Davis then drove defendant back to his Visalia apartment.

Davis said that later that night, defendant asked Davis to get into his car and drop him off someplace. Defendant drove his car and Davis sat in the passenger seat. Defendant stopped the car at a remote cornfield in the Matheny Tract, an area south of Tulare. It was dark and no one was around. Defendant got out of the car, Davis moved over to the driver's seat, and defendant opened the car's rear hatchback. Davis did not see whether defendant took anything out of the car.

Defendant told Davis that he needed to take care of something, and directed her to leave and then return in 15 or 20 minutes. Davis drove away and left defendant in the dark cornfield. Defendant kept calling Davis and saying he needed more time. About an hour later, Davis picked up defendant by the cornfield.

Davis told investigators that as she drove away from the cornfield, defendant told her that Bridget came over to his apartment that night, he was "going to let her go," and Bridget hit him in the head with a hammer. Defendant told Davis that "he grabbed her and choked her and killed her." Defendant told Davis that he had buried Bridget's body in the cornfield.[3]

---

[3] At trial, Davis denied telling the officers that defendant admitted he killed Bridget or that he buried her.

Defendant's cousin told the investigators that defendant said he argued with Bridget, and strangled and killed her, but he did not mean to do it.[4]

*Discovery of Bridget's body and forensic evidence*

Davis directed investigators to a cornfield in the Matheny Tract where she had left defendant on the night of September 11, 2001.

On October 2, 2001, Bridget's decomposed body was found buried in that cornfield.[5] Her car had been abandoned in a motel parking lot in Fresno.

There was a red stain on the bathroom floor in defendant's apartment, against the backboard and under a cabinet. A criminalist believed someone attempted to clean the stains by mopping the bathroom floor. The red stain was blood, and the blood contained a mixture of DNA from both Bridget and defendant.

Dr. Gary A. Walter, the pathologist, testified there was no evidence that Bridget died from stab or gunshot wounds. Bridget's body showed signs of moderate decomposition. Dr. Walter listed strangulation as the probable cause of death, based on the autopsy and the information he received from the investigating officers. There was some swelling and bruising around Bridget's neck, including the right thyroid gland which encircles the trachea below the larynx (voice box). This area was in the vicinity of the right cricoid cartilage, the first cartilage ring of the trachea just below the larynx. There was evidence of free blood within the thyroid gland and in the soft tissue of the trachea cricoid cartilage. Dr. Walter explained it was abnormal to find blood in the tissue and outside of the blood vessels. There was enough free blood in the thyroid gland and neck cartilage areas to support a conclusion of pressure and possible manual strangulation which could have resulted in suffocation. The trauma was only on the right side.

*Steve Long's statements*

At the time that Bridget disappeared, Steve Long, defendant's friend since high school, worked at a medical supply house. During the investigation, two

---

[4] At trial, defendant's cousin denied making these statements and claimed he never heard defendant say anything about killing Bridget.

[5] An investigator later attempted to replicate the act of using a shovel to dig a grave in the same cornfield at the same time of year. It took 40 to 46 minutes to dig a grave with the same dimensions as the one in which Bridget's body was found.

of Long's coworkers contacted the police and reported that Long made statements to them that seemed to be about the case, and he talked to them before they read about Bridget's disappearance in the newspaper.

James Meeks, one of Long's coworkers, testified that on the afternoon of September 11, 2001, Long asked Meeks if he heard about anyone missing or something happening to a woman. Meeks thought Long meant someone who was missing in that morning's terrorist attacks in New York. In the following days, however, Long continued to discuss the topic with Meeks. Long told Meeks that he had a discussion with someone about hitting a person over the head and what he would do with that person. Long said that "all you would have to do is hit them over the head. Just take them to a field and get rid of the car" in Fresno. Long told Meeks he was checking the newspaper every day. Meeks was shocked by Long's statements because they were "just straight out of the blue."

Long told another coworker, Flora Lopez, that he was scared of his friend "Eddie," and he would never testify against him. Long said that if something like that happened to him, he would dump the car in Fresno. Long said the body would be somewhere in a cornfield near Tulare, where no one could find it, because "the corn would grow and the machines were so big . . . that it would probably, they probably would never find it."[6]

When Meeks read the newspaper stories about Bridget, he thought "it was really weird and shocking because [he] felt like [he] kind of already knew all of this and for it to be in the paper it was really weird."[7]

*The trial*

Defendant was charged with first degree murder. During a lengthy jury trial, the prosecution moved to introduce evidence, pursuant to section 1109, that defendant committed prior acts of domestic violence against Bridget and four other girlfriends. The court granted the prosecution's motion and held the evidence was admissible. The court found that murder was an offense "involving domestic violence" within the meaning of section 1109, and that

---

[6] The prosecutor primarily relied on Long's statements as evidence to support the lying-in-wait special circumstance. The prosecutor argued that defendant told Long ahead of time how he was going to dispose of Bridget's body and her car, and the evidence raised the inference that defendant already had dug the grave in the cornfield before he lured Bridget to his apartment. The court rejected that argument and dismissed the lying-in-wait special circumstance for insufficient evidence. However, the court found the inferences from Long's statements were relevant for premeditation and deliberation.

[7] At trial, Long testified he made statements about the case only after it was reported in the newspaper and on television, and he denied making the specific statements claimed by Meeks and Lopez.

murder was "the ultimate form of domestic violence." The court held an extensive evidentiary hearing to evaluate the proposed testimony pursuant to section 352, excluded some of the evidence, and held the vast majority of the evidence was probative and admissible.

The four women who previously dated defendant separately testified about a series of domestic violence acts that defendant committed against them. They testified that he followed them when they were out with other people. They testified about specific incidents when defendant beat, kicked, choked, and threatened to kill them. They testified the incidents occurred both during and after they were involved in relationships with defendant, and often as a result of arguments when he was jealous and accused them of seeing other men.[8]

At trial, defendant testified he was still dating Bridget at the time of her death, and insisted he never touched Bridget except on the night that she died. Defendant claimed Bridget unexpectedly arrived at his apartment that night and attacked him with a hammer; he pushed her away; she flipped over his couch, and she died by accident. He admitted that he buried her body in the cornfield and disposed of her car. He obtained a shovel from his mother's house and Davis drove him to the cornfield. Defendant claimed he did these things because he had a panic attack and did not think the police would believe his story.

Defendant denied committing the domestic violence acts described by his previous girlfriends and claimed he was never jealous of their relationships with other men. Defendant admitted that he was involved in several altercations with some of the women and their boyfriends but claimed he only intervened when he was concerned about the safety of the children he had fathered with those women.

After a lengthy jury trial, defendant was convicted of first degree murder and sentenced to 25 years to life.

### ADDITIONAL FACTS*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[8] In the nonpublished portion of this opinion, we address in greater detail the testimony of these four women, particularly as to the facts and circumstances of the prior acts of domestic violence committed by defendant against each of them. We also address the trial court's determinations as to whether this evidence was admissible pursuant to section 352, and reject defendant's appellate arguments that the admission of the evidence was prejudicial.

*See footnote, *ante,* page 1222.

## DISCUSSION

I.  *Admission of Prior Acts of Domestic Violence in a Murder Prosecution*

Section 1109 provides, in relevant part, that "in a criminal action in which the defendant is accused *of an offense involving domestic violence*, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1), italics added.)

As applicable to this case, the court granted the prosecution's motion to introduce evidence that defendant committed prior acts of domestic violence against Bridget in the months prior to her death, and that he committed domestic violence acts against four previous girlfriends in the 1980's and 1990's. The court overruled defendant's objections that section 1109 permitted the introduction of propensity evidence only in a domestic violence prosecution, and found the propensity evidence was relevant and probative in this murder case based on the nature of the relationship between defendant and Bridget. In doing so, the court agreed with the prosecutor's assertion that murder was "the ultimate form of domestic violence."

We will review the provisions of section 1109, and then address defendant's contentions that prior acts of domestic violence were not admissible in this murder prosecution, and explain why murder is an "offense involving domestic violence" within the meaning of section 1109.

### A.  *Section 1109*

■ "Evidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts. (Evid. Code, § 1101.) However, the Legislature has created exceptions to this rule in cases involving sexual offenses (Evid. Code, § 1108) and domestic violence (Evid. Code, § 1109)." (*People v. Reyes* (2008) 160 Cal.App.4th 246, 251 [72 Cal.Rptr.3d 586].) "[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence." (*People v. Johnson* (2000) 77 Cal.App.4th 410, 420 [91 Cal.Rptr.2d 596].) Section 1109, in effect, "permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]" (*People v. Hoover*

(2000) 77 Cal.App.4th 1020, 1024 [92 Cal.Rptr.2d 208] (*Hoover*); see also *People v. Soto* (1998) 64 Cal.App.4th 966, 979–981 [75 Cal.Rptr.2d 605] [history of § 1108].) "[I]t is apparent that the Legislature considered the difficulties of proof unique to the prosecution of these crimes when compared with other crimes where propensity evidence may be probative but has been historically prohibited." (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1333–1334 [92 Cal.Rptr.2d 433], fn. omitted (*Brown*).)

The admission of prior acts as propensity evidence encompasses both charged and uncharged acts. (See, e.g., *People v. Falsetta* (1999) 21 Cal.4th 903, 917–918 [89 Cal.Rptr.2d 847, 986 P.2d 182] (*Falsetta*); *Brown, supra,* 77 Cal.App.4th at pp. 1332–1334; *People v. Garcia* (2001) 89 Cal.App.4th 1321, 1331–1332 [107 Cal.Rptr.2d 889].) Moreover, evidence of a prior act may be introduced as propensity evidence even if the defendant was acquitted of criminal charges based upon that act. (See, e.g., *People v. Mullens* (2004) 119 Cal.App.4th 648, 652, 665–668 [14 Cal.Rptr.3d 534].)

Even if the evidence is admissible under section 1109, the trial court must still determine, pursuant to section 352, whether the probative value of the evidence is substantially outweighed by the probability the evidence will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. (*Hoover, supra,* 77 Cal.App.4th at pp. 1028–1029.) The court enjoys broad discretion in making this determination, and the court's exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *Brown, supra,* 77 Cal.App.4th at p. 1337.)[14]

### B. *Admissibility of section 1109 propensity evidence in a murder prosecution*

Defendant contends that section 1109 permits the admission of prior acts of domestic violence only in a subsequent prosecution for a domestic violence offense. Defendant argues his prior acts against Bridget and his former

---

[14] Defendant renews an argument he raised before the superior court, that the admission of propensity evidence under section 1109 violated his federal constitutional rights to due process and equal protection. As noted by the superior court, and acknowledged by defendant, similar constitutional challenges have been repeatedly rejected, and courts have held the admission of evidence pursuant to section 1109 and its counterpart, section 1108, does not violate a defendant's rights to due process and equal protection. (*Falsetta, supra,* 21 Cal.4th at pp. 917–918; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703–704 [61 Cal.Rptr.3d 373]; *People v. Price* (2004) 120 Cal.App.4th 224, 240 [15 Cal.Rptr.3d 229]; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095–1096 [98 Cal.Rptr.2d 696] (*Escobar*); *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1309–1313 [97 Cal.Rptr.2d 727].)

girlfriends were inadmissible because he was not charged with committing domestic violence in the instant case; he was charged with murder, and murder is not listed in section 1109 as an offense involving domestic violence. Defendant's contentions raise the question of what is "an offense involving domestic violence" within the meaning of section 1109.

■ Section 1109 does not contain an enumerated list of offenses which are defined as those "involving" domestic violence. However, section 1109, subdivision (d)(3) provides some guidance on the question: " 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense."[15]

We thus turn to Penal Code section 13700, which defines "domestic violence" as *"abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship."* (Pen. Code, § 13700, subd. (b), italics added.) Bridget was someone with whom defendant had a dating relationship for two years, and came under the definition contained in Penal Code section 13700, subdivision (b).

Penal Code section 13700 defines " '[a]buse' " as *"intentionally or recklessly causing or attempting to cause bodily injury,* or placing another person in *reasonable apprehension of imminent serious bodily injury* to himself or herself, or another." (Pen. Code, § 13700, subd. (a), italics added.) The prosecution's evidence showed that defendant "intentionally or recklessly" caused bodily injury to Bridget, and placed her "in reasonable apprehension of imminent serious bodily injury" when he fatally strangled her. (*Ibid.*)

The prosecution's theory was that defendant strangled and killed Bridget because he was angry and jealous that she had broken up with him and was seeing another man, and that theory was firmly supported by the events leading up to Bridget's death. Bridget told a coworker that defendant tried to strangle her

---

[15] Family Code section 6211 defines domestic violence "more broadly" than the more restrictive provisions of Penal Code section 13700. (*People v. Dallas* (2008) 165 Cal.App.4th 940, 953 [81 Cal.Rptr.3d 521]; *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1143–1144 [110 Cal.Rptr.3d 913] (*Ogle*).) However, section 1109 limits the Family Code's definitions to domestic violence acts which occurred "no more than five years before the charged offense." (§ 1109, subd. (d)(3).) The vast majority of defendant's prior acts against his former girlfriends occurred more than five years before Bridget's homicide in 2001. We will thus focus on the domestic violence definitions contained in Penal Code section 13700. (Cf. *Ogle, supra,* 185 Cal.App.4th at p. 1143.)

during an argument. Bridget warned a former boyfriend that she could not greet him in public if she was with defendant because it could be harmful for her. Bridget told another former boyfriend that defendant had threatened her life because she broke off their relationship, and defendant said he would kill Bridget and whomever she was with.

Bridget's family testified that defendant repeatedly and continuously tried to call her in the weeks after they broke up. There was evidence that defendant was watching Bridget because he followed her family when they drove to dinner, and he showed up at her house when she was dating McKinnie and tried to confront Bridget and McKinnie. Defendant also followed McKinnie as he drove away from Bridget's house and signaled that he should pull over; McKinnie ignored defendant and kept driving.

Bridget's niece testified that on the night she disappeared, Bridget had an angry telephone call with "Eddie" and demanded to know what he wanted. Bridget walked out of the house and said she would be right back, but her family never saw her again. Shortly afterward, defendant's neighbor saw Bridget walk into defendant's apartment, and noticed Bridget's car was parked at the curb. Several hours later, however, a neighbor realized Bridget's car was gone.

Defendant's half sister, Davis, told the officers that defendant said he argued with Bridget at his apartment that night, he was "going to let her go," but "he grabbed her and choked her and killed her."

Based on the prosecution's evidence, defendant was alleged to have "intentionally or recklessly" caused bodily injury to Bridget, and placed her "in reasonable apprehension of imminent serious bodily injury," within the scope of the statutory language, when he fatally strangled her. (Pen. Code, § 13700, subd. (a).) Defendant was thus "accused of an offense involving domestic violence" within the meaning of section 1109 when he was charged with the first degree murder of Bridget, and the court properly found that his prior acts of domestic violence were admissible as propensity evidence in this case.

We find support for this conclusion in the legislative history of section 1109:

"[T]he legislative history of the statute recognizes the special nature of domestic violence crime, as follows: 'The propensity inference is particularly appropriate in the area of domestic violence *because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of*

*dominance and control, that scheme usually escalates in frequency and severity.* Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, *we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner.* Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.' (Assem. Com.[] on Public Safety[, Analysis of Sen. Bill No. 1876 (1995–1996 Reg. Sess.) (June 25, 1996) pp. 3–4.) Moreover, the special nature of domestic violence cases is legislatively recognized in enactments such as the Law Enforcement Response to Domestic Violence, sections 13700 through 13731.

"Based on the foregoing, the California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence." (*People v. Johnson, supra,* 77 Cal.App.4th at pp. 419–420, italics added.)

The policy reasons for the admission of propensity evidence under section 1109 were also addressed in *People v. Poplar* (1999) 70 Cal.App.4th 1129 [83 Cal.Rptr.2d 320] (*Poplar*), where the defendant was convicted of the forcible rape of his girlfriend. He argued that his prior acts of domestic violence were improperly admitted at trial because the rape prosecution was not an offense involving domestic violence, and section 1109 and Penal Code section 13700 " 'refer to the classic kind of pushing, shoving, hitting, slapping, punching' and not to 'a specific sexual offense such as rape.' " (*Poplar,* at p. 1138.)

*Poplar* rejected the defendant's argument and held that section 1109's "definition of domestic violence/abuse ('reasonable apprehension of imminent serious bodily injury to . . . herself') encompasses the definition of rape ('fear of immediate and unlawful bodily injury on the person'). The defendant was charged with an offense involving domestic violence, that is, rape. As the prosecutor argued, *rape is a higher level of domestic violence, a similar act of control.*" (*Poplar, supra,* 70 Cal.App.4th at p. 1139, italics added.)[16]

---

[16] A series of cases has held that the admission of prior acts of domestic violence pursuant to section 1109, in prosecutions for murder, attempted murder, and rape, did not violate the defendants' rights to due process. (See, e.g., *People v. Johnson, supra,* 77 Cal.App.4th 410, 419–420 [admission of defendant's prior acts of domestic violence in prosecution for first degree murder of his wife did not violate due process]; *Escobar, supra,* 82 Cal.App.4th at pp. 1094–1097 [same]; *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1120 [25 Cal.Rptr.3d 62] [admission of prior acts of domestic violence in prosecution for attempted murder of former boyfriend did not violate due process].) In reaching these conclusions, however, the

As applied to the instant case, the facts and circumstances of defendant's relationship with Bridget were indicative of defendant's " 'larger scheme of dominance and control' " which he attempted to exercise over Bridget as he became angry, watched her activities, followed her, and tried to prevent her from having any other relationships. (*People v. Johnson, supra*, 77 Cal.App.4th at p. 419.) Defendant's prior acts of domestic violence, committed against the four women he dated before Bridget, were also indicative of "cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner." (*Ibid.*)

■   Given the legislative history and the language of section 1109, we agree with the trial court's observation in this case that murder is "the ultimate form of domestic violence," and that defendant's prior acts of domestic violence were admissible based on the nature and circumstances of his relationship with and conduct toward Bridget. Defendant was charged with first degree murder based on strangling Bridget, his former girlfriend, after a lengthy period in which he tried to intimidate her because she chose to break up with him. He was clearly "accused of an offense involving domestic violence" within the meaning of section 1109.

■   Defendant contends that prior acts of domestic violence are not relevant for any purpose in a murder prosecution because such acts do not permit an inference as to malice or any particular mental state. However, a defendant's propensity to commit domestic violence against a former girlfriend who was murdered, and other prior girlfriends who were assaulted, is relevant and probative to an element of murder, "namely, [defendant's] intentional doing of an act with malice aforethought that resulted in the victim's death." (*Smith v. Roe* (C.D.Cal. 2002) 232 F.Supp.2d 1073, 1088, fn. 12.) A defendant's pattern of prior acts of domestic violence logically leads to the inference of malice aforethought and culpability for murder.

### C.   Walker, Story, *and section 1108*

Defendant acknowledges the statutory definitions contained within section 1109, but still asserts that prior acts of domestic violence are not admissible in a murder prosecution because murder is not listed as a crime involving domestic violence in section 1109, Penal Code section 13700, or Family Code section 6211. Defendant relies on *People v. Walker* (2006) 139 Cal.App.4th 782 [43 Cal.Rptr.3d 257] (*Walker*) and *People v. Story* (2009) 45 Cal.4th 1282 [91 Cal.Rptr.3d 709, 204 P.3d 306] (*Story*) in further support of these arguments.

---

courts did not specifically address whether the charged offenses were within section 1109's definition of "domestic violence."

As we will explain, however, *Walker* and *Story* interpreted section 1108, which is the counterpart to section 1109. Section 1108 provides in relevant part: "In a criminal action in which the defendant is accused of *a sexual offense*, evidence of the defendant's commission of *another sexual offense or offenses* is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (§ 1108, subd. (a), italics added.)

While sections 1108 and 1109 have been described as "virtually identical" (*People v. Johnson, supra,* 77 Cal.App.4th at p. 417; see *People v. Johnson* (2008) 164 Cal.App.4th 731, 739 [79 Cal.Rptr.3d 568]), there are important statutory distinctions relative to defendant's definitional arguments in this case.

As we have explained, section 1109 provides for the introduction of propensity evidence in a prosecution for an offense "involving domestic violence," by reference to the definitions in Penal Code section 13700 and Family Code section 6211. (§ 1109, subd. (a)(1).) Neither the Penal Code nor the Family Code contains a list of enumerated domestic violence offenses. (See, e.g., Fam. Code, § 6203; Pen. Code, § 13700, subd. (a).)

In contrast, section 1108, subdivision (a), provides for the introduction of propensity evidence when a defendant is accused of "a sexual offense." Section 1108, subdivision (d)(1) "defines 'sexual offense' as a crime under the law of a state or of the United States involving *either conduct proscribed by a series of enumerated Penal Code sections* or nonconsensual sexual contact. It also includes in the definition, in [section 1108,] subdivision (d)(1)(E), any crime that involves '[d]eriving sexual pleasure or gratification *from the infliction of death,* bodily injury, or physical pain on another person.' " (*Walker, supra,* 139 Cal.App.4th at pp. 797–798, italics added.)

Given this background, the defendant in *Walker* was charged with the murder of a prostitute. The parties stipulated there was no medically valid way to determine whether the sexual contact between the defendant and the victim was consensual. At the defendant's murder trial, the court relied on section 1108 and permitted the prosecution to introduce evidence of the defendant's prior sexual assaults on other prostitutes. (*Walker, supra,* 139 Cal.App.4th at pp. 789–792.)

*Walker* reversed the defendant's murder conviction and held: "Section 1108, subdivision (a), limits the statute's scope to criminal actions in which the defendant is 'accused of a sexual offense'; and subdivision (d)(1) defines 'sexual offense' to mean a 'crime . . . that *involve[s]' certain categories and enumerated types of sexual misconduct.* In ordinary usage these terms connote that the requisite sexual transgression must be an element or

component of the crime itself without regard to the evidence establishing a specific violation. [Citations.]" (*Walker, supra,* 139 Cal.App.4th at p. 800, italics added.) *Walker* held that "whether a crime involves deriving sexual pleasure or gratification from inflicting physical pain should . . . be determined from the elements of the offense alone and not from the evidence establishing a particular violation of the law." (*Ibid.*)

In *Story,* the defendant was convicted of first degree felony murder for strangling his coworker based on the underlying offenses of rape and burglary. (*Story, supra,* 45 Cal.4th at pp. 1285–1288.) The trial court admitted evidence under section 1108 that the defendant committed four other sexual assaults prior to and following the murder. (*Story, supra,* at pp. 1285–1288.) The appellate court reversed the defendant's conviction and held the section 1108 propensity evidence was improperly admitted because the defendant was not " 'accused of a sexual offense' " within the meaning of section 1108, since murder " 'is not found in any of the enumerated Penal Code sections nor does it include as a necessary element nonconsensual *sexual* contact.' " (*Story, supra,* at p. 1291, original italics.)

The California Supreme Court in *Story* disagreed with the appellate court's conclusions and affirmed the defendant's murder conviction. *Story* declined to address whether *Walker* was properly decided, but held that *Walker* was distinguishable since it did not involve or discuss "the question whether an open murder charge prosecuted as first degree murder on a rape-felony-murder theory is a sexual offense under section 1108." (*Story, supra,* 45 Cal.4th at p. 1292.) *Story* further held that even under *Walker,* the defendant had been charged with first degree felony murder with rape as an underlying felony, which meant he was accused of a sexual offense within the meaning of section 1108. (*Story,* at p. 1292.)

*Story* held it was particularly probative for the jury to learn about the defendant's history of sexual assaults in determining what happened in the victim's home the night the defendant strangled her. (*Story, supra,* 45 Cal.4th at p. 1293.) *Story* found support for this conclusion in *People v. Pierce* (2002) 104 Cal.App.4th 893 [128 Cal.Rptr.2d 397], which held that assault with the intent to commit rape was a crime involving conduct proscribed by the sex offenses listed in section 1108, although it was not specifically listed as a sexual offense under section 1108. (*Story, supra,* at p. 1293.) *Story* concluded "that section 1108 applies at least when the prosecution accuses the defendant of first degree felony murder with rape (or another crime specified in § 1108, subd. (d)(1)), or with burglary based on the intent to commit rape (or other sex crime), [as] the underlying felony." (*Story, supra,* at p. 1294.)

While *Story* and *Walker* are based on section 1108, and *Story* held the propensity evidence was properly admitted, defendant contends the reasoning of those cases is equally applicable to section 1109. Defendant asserts that prior acts of domestic violence cannot be introduced in a murder case pursuant to section 1109 "because murder is not designated as an offense involving domestic violence which by analogy to [*Story* and *Walker*] is required. . . . [I]t is clear that by not designating murder in . . . section 1109, murder is excluded."

*Walker* and *Story* do not support defendant's arguments. First, *Walker* is inapplicable to this case since the language in section 1108 is not as broad as that used in section 1109. Section 1108, subdivision (a), permits the admission of propensity evidence when the defendant "is accused of a sexual offense," whereas section 1109, subdivision (a)(1) provides for the admission of propensity evidence when the defendant "is accused of an offense *involving* domestic violence." (Italics added.)

Second, section 1109 does not contain the same list of enumerated offenses as section 1108, which was partially the basis for *Walker*'s conclusions. Instead, section 1109, subdivisions (a)(1) and (d)(3) define a prosecution "involving" domestic violence by reference to definitions contained in Penal Code section 13700 and Family Code section 6211, neither of which contains an enumerated list of offenses. Third, *Story* actually supports the introduction of the propensity evidence in this case, given its determination that *Walker*'s interpretation of section 1108 was overly restrictive.

We conclude that the court properly found that defendant's prior acts of domestic violence were admissible under section 1109 in this murder prosecution.[17]

II.–VIII.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[17] As we have explained, even if the evidence is admissible under section 1109, the trial court must still exercise its discretion pursuant to section 352 and determine whether the probative value of the evidence is substantially outweighed by the probability the evidence will consume an undue amount of time, or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. (*Hoover, supra,* 77 Cal.App.4th at pp. 1028–1029.) In the nonpublished section of this opinion, we address the trial court's specific and detailed section 352 rulings in this case, and find the court properly admitted the evidence.

[*] See footnote, *ante*, page 1222.

## DISPOSITION

The judgment is affirmed.

Hill, P. J., and Levy, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 8, 2011, S191859.