Filed 12/16/13  P. v. Martinez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056202 |
| v. | (Super.Ct.No. INF063996) |
| RON DWAYNE MARTINEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Richard A. Erwood, Judge.  Affirmed.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Meagan J. Beale, and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

## INTRODUCTION

Defendant Ron Dwayne Martinez admitted he killed his girlfriend, Karyn Kleine, and dumped her body in the desert.  A jury found defendant guilty of second-degree murder.  (Pen. Code, § 187, subd. (a).)  The trial court sentenced defendant to a prison term of 15 years to life.

On appeal, defendant challenges the admission of testimony from two of his former girlfriends; the absence of a limiting instruction about Kleine's nonhearsay statements; and the court's prohibition on the testimony by Kleine's former boyfriend. Defendant further asserts cumulative error violated his rights to due process and a fair trial justifying reversal of his murder conviction.  We conclude there was no prejudicial error and no cumulative error and affirm the judgment.[1]

# II

## STATEMENT OF FACTS

*A. Kleine's Death*

Defendant and Kleine became involved in 2006.  The following events related to her death occurred in February and March 2007.

---

[1] We decline to make a redetermination of our previous order of November 13, 2012, denying defendant's request to unseal the victim's mental health records.

Defendant worked for Budget Rent A Car. On February 22, 2007, he called the office to say that he would be late because he had just broken up with his girlfriend, who had thrown him out, leaving him homeless.

In February, Kleine's former boyfriend, Patrick Ross, encountered her at the Spa Resort Casino in Palm Springs. Ross noticed Kleine had a bruised wrist. Kleine said defendant had grabbed her during a "scuffle" and had broken her purse strap. Kleine confided in Ross she was afraid of defendant because he was controlling and possessive. Ross and Kleine began dating again and he spent the night at her apartment on March 7, 2007.

Sometime in early March, Kleine's neighbor, Ernest Hendrix, overheard Kleine and defendant arguing. As defendant was leaving, Hendrix heard defendant say to Kleine, "Bring it on. I'll kill you."

On March 8, 2007, defendant lost his temper at work. He became upset and threw a stack of car rental contracts on the floor. At lunchtime on March 9, 2007, when a customer complained to defendant, he responded angrily, "I don't need to take your shit," and walked off the job.

The Spa Resort Casino had surveillance video footage of Kleine in the casino on March 9, 2007, after 11:00 p.m. The video showed her walking through the casino wearing blue jeans and a light-colored blouse and leaving at 11:30 p.m.

Ross and Kleine planned to see each other on March 10, 2007, but her car was missing when he went to pick her up. When Kleine did not respond to his messages, Ross called the police on March 11, 2007.

3

On March 16, 2007, defendant returned to Budget to collect his final paycheck. His supervisor thought defendant seemed jumpy and was wearing a baseball cap to cover part of his face. On March 16, 2007, defendant cashed his final paycheck at the Cash Mart in Palm Springs. Defendant obtained an Arizona driver's license on March 26, 2007.

On March 17, 2007, the Indio police found Kleine's car with the keys in the ignition in the Indio Fashion Mall parking lot.

*B. Subsequent Investigation*

According to Department of Motor Vehicles (DMV) records, defendant was 5 feet 10 inches tall and 175 pounds and Kleine was 5 feet 3 inches tall and 122 pounds.

The parties stipulated that, according to a DNA analysis of bloodstains in Kleine's car, defendant was the major contributor and Kleine was a minor contributor of DNA found on the car key and the steering wheel cover. Kleine's DNA was also found in many places of the front passenger area.

On September 21, 2007, the Palm Springs police found Kleine's skeletal remains, partially buried near a creosote bush in a vacant lot across from the Palm Springs DMV. Nearby were a pair of blue jeans, size 11, and a weathered roll of duct tape.

The victim's remains were mostly bones with only a small amount of connective tissue and no sign of trauma to the bones themselves. Based on the location and concealment of the remains and other circumstances, the pathologist could not exclude homicide as the cause of death. The pathologist thought duct tape possibly had been

4

placed over the victim's nose and mouth, causing death by asphyxiation, although it could not be determined whether it was placed there before or after she died.

On December 20, 2007, Detective Frank Browning telephoned defendant in Arizona, where he was working for a trucking company. Defendant said he had learned from his ex-wife that Kleine was missing. He told Browning he had dated Kleine for about a year and she gambled too much. He broke up with Kleine a month before leaving California—definitely before Valentine's Day, February 14, 2007. Defendant claimed the only time he became physical with Kleine was when he grabbed her by the wrist. He would never hit a woman because he saw his father abuse his mother. Browning asked if Kleine might have committed suicide and defendant responded that Kleine had been in a car accident and required a lot of pain medication. Defendant agreed suicide was a possibility because Kleine was being treated for anxiety and a panic disorder.

Defendant was arrested in November 2008 at his new wife's house in Nevada. In a telephone call made from jail to his sister, Cynthia Weightman, and a person named Leroy, defendant said, "It was self-defense all the way and it's being turned on me." Leroy asked "did it happen?" Defendant replied, "It happened in the car." In additional phone calls, defendant told Weightman some test results could affect the outcome of his case and that he was probably going to prison but the goal was to minimize his sentence.

## C. Other Prosecution Evidence

Three witnesses testified about Kleine's back injury. Ross knew Kleine had back problems. Kleine's friend and neighbor, Gail Kibe, testified Kleine needed assistance lifting things and she helped Kleine carry groceries and bags of dog food.

5

Kleine's hairdresser, Jennifer Moreno, testified that Kleine could not sit for a long time due to a neck and back injury that had required surgery. Kleine had told Moreno defendant had grabbed her and yelled at her during an argument in November or December 2006. Kleine also told Moreno that defendant would circle Kleine's apartment complex and follow her to the casino.

*D. Defendant's Testimony*

Defendant became involved with Kleine in 2006 and moved into her apartment when he was working for Budget. Their relationship soured because of arguments about money and Kleine's gambling. When defendant tried to leave Kleine after two months, she threatened him with a knife in the kitchen. She brandished a knife at him again two months later. Kleine also knocked defendant down two times, once when he was trying to leave the apartment and again two months later. Defendant never hit Kleine although she hit him and screamed at him. After moving out of their apartment, he became homeless and quit his job at Budget.

On the night that Kleine was killed, defendant went to see her at the Spa Resort Casino and they decided to get something to eat and talk. Kleine gave him her car keys and he drove. They began to argue about money and the argument escalated. When Kleine made a comment about defendant's children being a mistake, he stopped the car. They began shouting and he called her a freak. She replied, "You're the freak. You think you're Batman" and "Well, I'm the Joker." She lunged at him and began choking him. Defendant was pinned against the car and felt his windpipe begin to close. He felt that

6

his life was threatened.  At that point, his "muscle memory took over" and he struck her about 10 times around the shoulder and head.

Defendant testified that "Batman" was a protector and a hero to him, part of his public and private life—the injustices he saw in society and Batman as a shield for strength and protection.  When Kleine began to choke defendant, he became Batman and she became the Joker.  His "primal" instincts kicked in, requiring him to defend himself.

After he hit Kleine, she became motionless and unresponsive.  There was a lot of blood.  She had no heartbeat.  After driving aimlessly, he decided to lay her out in the desert under a bush.  He taped her head to cover the blood.  He covered the body with dirt and branches but intentionally left it partly exposed.  He parked the car with the keys in the Indio Fashion Mall.  He did not clean up the blood.

## E.  Defendant's Abusive Childhood

Defendant's sister, Weightman, was one year older than him.  Their father was extremely violent, repeatedly beating defendant, Weightman, and their mother.  It seemed to Weightman that their father beat defendant constantly, leaving bruises and welt marks.  Weightman told Dr. Jones defendant's mother had sexually abused him.  Weightman left home when she was 16 because she could no longer endure the violence.  Defendant joined the Navy when he turned 18.

## F.  Defendant's Marriage to Diana Boone

Before these events, defendant had been married to Diana Boone, with whom he had two children.  Defendant was possessive and jealous of other men.  He threw things when he was angry.  Against defendant's wishes, they divorced in 2003.  Defendant lost

7

his job and had to move into a small apartment. He tried unsuccessfully to date other women.

*G. Defendant's Psychological Evidence*

Beginning in 2005, defendant received various psychological diagnoses, including depression NOS (not otherwise specified); bipolar disorder with an unspecified personality disorder; suicidal ideation; major depressive and adjustment disorder; and post-traumatic stress disorder (PTSD). Symptoms of PTSD are anxiety and fear surrounding the activities that remind the person of the traumatic event. Based on defendant's childhood history of being beaten and sexually abused, Dr. William Jones opined that defendant suffered from PTSD. Dr. Jones also diagnosed appellant as suffering from depression and a bipolar disorder.

Other facts pertinent to defendant's appellate arguments will be discussed below.

III

ADMISSION OF PRIOR ACTS OF DOMESTIC VIOLENCE

*A. Testimony of Patricia Jernigan and Cynthia Wolter*

Patricia Jernigan dated defendant in May and June 2005. Jernigan became uncomfortable with defendant who intimidated her with his possessiveness. He was angry that she had pictures of male friends on her computer. On June 28, 2005, he began harassing her. Once, he seemed to be stalking her in her driveway. He left threatening messages on her cell phone saying that no woman would ever leave him because he would end the relationship first. One evening, defendant called her cell phone 35 times. He beat angrily on her front door. In addition, he came to the restaurant where she

8

worked. Jernigan became so afraid of defendant that she changed cars and stayed with friends until she could relocate her family.

Within three weeks after Cynthia Wolter began dating defendant, he gave her a ring, which made her uncomfortable. He yelled at her because she spoke to other men at a public performance. Defendant would appear at places uninvited. Wolter was afraid because she knew defendant was following her. She ended the relationship in December 2005.

On January 6, 2006, after Wolter found dead flowers on her desk, defendant yelled at her from outside her real estate office. She locked her office door and went outside. Defendant continued to scream profanities at her and to call her a whore. She asked him to calm down and leave because he was scaring her. When he left, he said, "I'll be back. It's not over yet." Wolter called security and, as she was speaking to an officer, defendant returned before running away. Eventually defendant was detained and admitted to the officer that he had cursed at Wolter and called her a whore. He said he had a problem with women and the way they lied to him. Defendant pleaded guilty to Penal Code section 148, obstructing or delaying a peace officer in the performance of his duties.

B. *Trial Court's Ruling*

Defense counsel objected to the admission of Jernigan and Wolter's testimony on the grounds that defendant's prior bad acts were disturbing but not violent. Because defendant neither hit nor threatened to hit Jernigan or Wolter, his prior bad acts did not tend to show defendant had a propensity for violence.

9

The trial court allowed evidence of prior bad acts of domestic violence to show defendant's propensity to commit murder and to refute his claim of self-defense. (Evid. Code, §§ 1103, 1109.) The trial court ruled that the evidence was relevant to show his history of aggression towards women and was probative to show that he was the aggressor in the confrontation with Kleine. The trial court further found that the probative value of this evidence outweighed its prejudicial effect and ruled the evidence was admissible under Evidence Code section 352.

The trial court ultimately instructed the jury pursuant to CALCRIM No. 852 on the appropriate use of the domestic violence evidence as follows:

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit murder as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by

10

itself to prove that the defendant is guilty of murder. The People must still prove the charge beyond a reasonable doubt."

*C. Analysis*

On appeal defendant again argues he had not engaged in a pattern of actual physical violence towards women from which an inference could be made that he had a propensity to murder. Therefore the admission of Jernigan and Wolter's testimony, coupled with CALCRIM No. 852, violated of his right to due process and a fair trial. (U.S. Const., 5th, 6th & 14th Amends.; Cal. Const., art I, § 15; cf., *People v. Earle* (2009) 172 Cal.App.4th 372, 397-398.)

Evidence of prior bad acts of a defendant is generally inadmissible to show a predisposition to commit crimes except for sexual offenses and domestic violence cases. (Evid. Code, §§ 1101, 1108, and 1109; *People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233.) The reason for admitting other crimes evidence in domestic violence cases reflects "the difficulties of proof unique to the prosecution of these crimes . . . ." (*Id*. at p. 1233.) Propensity evidence can be both charged and uncharged offenses and it can be introduced even if the defendant was acquitted of the acts. (*Id*. at p. 1233.) Although the trial court retains broad discretion over the determination of the admission of this evidence, "the trial court must still determine, pursuant to section 352, whether the probative value of the evidence is substantially outweighed by the probability the evidence will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury." (*Id*. at p. 1233.) The *Brown*

11

court affirmed the trial court's ruling that "murder is the ultimate form of domestic violence." (*Id.* at pp. 1225, 1233-1240.)

Evidence Code section 1109 permits admission of a defendant's other acts of domestic violence for the purpose of showing a propensity to commit crimes of domestic violence. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024.) It is the relevance of the prior acts to show a propensity to commit crimes of domestic violence that makes the evidence in this case admissible, not because it shows a propensity to commit murder. As the appellate court in *Brown* held, murder becomes a crime of domestic violence when the facts show it falling within the statutory definitions, which broadly define domestic violence to include a wide variety of crimes committed under those circumstances. (*People v. Brown, supra*, 192 Cal.App.4th at pp. 1234-1237.)

As discussed in *People v. Hoover, supra,* 77 Cal.App.4th at pages 1027-1028, the legislative findings made in enacting Evidence Code section 1109 recognized that, within the broad category of domestic violence, there is great likelihood of a larger scheme of dominance and control that usually escalates in frequency and severity. The broad reach of the statute is necessary to address effectively the ongoing nature of domestic violence. The inference of propensity from one act of domestic violence to a different and more serious and violent act of domestic violence is readily inferable by a jury. The trial court correctly decided defendant's prior acts of domestic violence were highly relevant to the issue of defendant killing Kleine.

Both the prosecutor and defense counsel characterized defendant's conduct against Jernigan and Wolter as stalking. Read together, Family Code sections 6203, 6211, and

12

6320 define "domestic violence" to include abuse such as stalking, threatening, harassing, or telephoning another person with whom defendant had a dating relationship. Stalking clearly is domestic violence under Family Code section 6211 and is admissible pursuant to Evidence Code section 1109 when, as here, the prior stalking behavior occurred within five years of the charged offense. (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1142-1143.) In addition, based on the evidence of defendant's relationship with and actions toward Kleine, the charged murder was also an act of domestic violence. (*People v. Brown, supra,* 192 Cal.App.4th at p. 1237.)

A repetitive and escalating scheme is also evident in this case. In all his relationships—with his girlfriends and his ex-wife—defendant demonstrated his need for dominance and control based on how he intimidated the women and made them uncomfortable with his possessiveness. He refused to accept the end of his marriage and his brief relationships with Jernigan and Wolter. Not long after starting his relationship with Kleine, during an argument, defendant bruised her wrist and broke her purse. Defendant stalked Kleine after they broke up. Her neighbor overheard his threat to kill her. Defendant's pattern of behavior against women fully supported the trial court's finding the Jernigan and Wolter evidence was relevant to show a propensity to commit domestic violence against Kleine.

Defendant relies on *People v. Earle, supra,* 172 Cal.App.4th 372. However, the *Earle* case dealt with the admissibility of evidence of a prior uncharged sexual offense under Evidence Code section 1108. (*Earle,* at p. 396.) In *Earle*, the appellate court considered whether the defendant's act of indecent exposure was relevant propensity

13

evidence to a rape charge. (*Id.* at p. 396.) The court was unwilling to find the jury could conclude that commission of indecent exposure had a tendency to show a propensity to commit rape, absent some additional foundational support for that conclusion. (*Id.* at pp. 398-399.) As already noted, Evidence Code section 1109 does not apply to a specific and narrow type of crime, but applies broadly to crimes committed under particular circumstances. (*People v. Brown, supra*, 192 Cal.App.4th at pp. 1234-1237.)

Additionally, there was little basis for prejudice under Evidence Code section 352. In assessing other crimes evidence, a trial judge must consider such factors as its nature, relevance, and possible remoteness; the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry; its similarity to the charged offense; its likely prejudicial impact on the jurors; the burden on the defendant in defending against the uncharged offense; and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other offenses, or excluding irrelevant though inflammatory details surrounding the offense. (*People v. Falsetta* (1999) 21 Cal.4th 903, 916 [discussing prejudice analysis under Evid. Code, §§ 352, 1108].)

In this case, defendant's acts of domestic violence against Jernigan and Wolter were not physically violent although he made threats of violence. Defendant's conduct was highly relevant to the issue of who was the aggressor in Kleine's death; none of the acts were remote; defendant admitted some of his acts to law enforcement; and it was unlikely that the jurors would be confused, misled, or distracted by the prior acts and independent witnesses. Although the prior acts reflected badly on defendant, they were

14

not particularly inflammatory in light of the evidence of the charged murder. The jury was cautioned it should not convict defendant because he stalked Jernigan and Wolter. If the prior act evidence made defendant seem "scary," it was because it showed him to be aggressive, controlling, demanding, and punitive toward women. In other words, it showed his propensity to commit acts of domestic violence and murder. Therefore, the trial court did not abuse its discretion and did not violate defendant's due process right to a fair trial by admitting evidence of his prior acts of domestic violence. For the same reasons, any error was harmless.

IV

KLEINE'S NONHEARSAY STATEMENTS

Several of Kleine's hearsay statements were admitted in order to establish that she was fearful of defendant and would not have gone with him voluntarily the night she was killed. (Evid. Code, § 1250.) Ross testified that Kleine told him defendant bruised her wrist and broke her purse strap when he struggled with her. Kleine also told Ross she was afraid of defendant because he was controlling and possessive. Moreno testified that Kleine told her defendant grabbed her during an argument, yelled at her, and stalked her at home and the casino. The trial court ruled that all of Kleine's hearsay statements were admissible under Evidence Code section 1250. At trial, when defendant testified, he admitted grabbing Kleine's wrist. He also admitted following women and spying on them and following Kleine to the casino.

In *People v. Riccardi* (2012) 54 Cal.4th 758, 800-825, the California Supreme Court indicated that state-of-mind evidence includes two categories with different

15

theories of admissibility. (*Id*. at p. 822.) On the one hand are the statements of the victim that she is afraid of the defendant which are admissible under Evidence Code section 1250 as exceptions to the hearsay rule. (*Ibid*.) On the other hand are nonhearsay statements. "In the nonhearsay category of statements were [the victim's] indirect declarations of her state of mind, because they contained descriptions or assessments of defendant's conduct that engendered [her] fear or altered her conduct—e.g., '[Defendant] kidnapped me at gunpoint.' These statements were not hearsay to the extent they were admitted to prove circumstantially [her] state of mind or conduct, and not to prove the truth of the matters asserted regarding defendant's conduct. [Citations.] This nonhearsay category of statements presents an elevated danger of prejudice if the jury is unable to distinguish between the truth of the matters asserted and the inferences concerning the declarant's state of mind. [Citation.]" (*Id*. at p. 823.)

Defendant argues the court should have given a limiting instruction to prevent the jury from considering the nonhearsay evidence as evidence of defendant's conduct. (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 889-890.) The trial court, however, had no duty, absent a request, to give a limiting instruction. (*People v. Riccardi, supra*, 54 Cal.4th at pp. 824-825.) We reject defendant's suggestion that his failure should be excused because any request for a limiting instruction would have been futile. The limited admissibility of the mixed statements was not raised when the evidence was discussed. The fact the trial court ruled the mixed statements were admissible did not relieve defense counsel of the obligation to request a limiting instruction for the portions of the statements which also described defendant's conduct. (*Riccardi,* at p. 825.)

16

Defendant also proposes his trial counsel's failure to request a limiting instruction amounted to ineffective assistance of counsel (IAC). However, the decision to seek a limiting instruction carries with it the assessment of whether "the risk of such an instruction highlighting the defendant's conduct outweighs any benefit the instruction may provide." (*People v. Riccardi, supra*, 54 Cal.4th at p. 825.) Because defense counsel was not asked to explain but there could be a satisfactory explanation for the lack of a request, deficient performance cannot be found on this record. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Furthermore, as defendant concedes, a more favorable result is not reasonably probable if a limiting instruction had been given. Because defendant admitted the acts related in the nonhearsay statements, there could be no prejudice. (*Riccardi,* at p. 828.) In the absence of deficient performance or prejudice, the IAC claim lacks merit.

V

CHRISTIE'S TESTIMONY ABOUT KLEINE'S VIOLENT NATURE

Kleine's ex-boyfriend, Patrick Christie, testified she was a violent person who would get physical and punch him. She hit him more than a few times. When Christie tried to leave the apartment after an argument, Kleine pushed him, grabbed him in a bear hug, and choked him. The incident left black and blue marks on Christie's neck. Most of the time, they argued about money. During an argument, Christie saw Kleine strike her handicapped brother on the side of his head. After that incident, Christie broke up with Kleine and moved out.

17

On a later occasion, Christie met Kleine at a party and went to a convenience store where they engaged in a shouting match about whether to go to a casino. The store clerk called the police and Christie was arrested for disturbing the peace.

In a Evidence Code section 402 hearing, the prosecution asked the trial court to exclude additional evidence that Kleine would become violent specifically when she and Christie argued about money. The prosecutor contended that this was character evidence, not relevant to anything in the trial. Defense counsel argued the evidence was relevant to explain why defendant's arguments over money with Kleine would also become violent. The trial court ruled Christie's arguments with Kleine about money should be excluded as irrelevant to any issue in the trial.

In spite of the trial court's ruling, the record reflects that defense counsel successfully elicited from Christie that Kleine became violent when they argued about money and they also argued about gambling. Since the evidence was presented, defendant was not prejudiced by the ruling.

Additionally, while Kleine's gambling may have been a reason she argued about money with both men, Kleine purportedly became violent towards defendant for other reasons. According to defendant, Kleine did not begin choking him until she criticized his children and defendant mocked her about gambling and called her the Joker. Thus, there was neither error in the trial court's ruling nor any prejudice to defendant.

18

# VI

## CHRISTIE'S TESTIMONY ABOUT KLEINE'S BACK INJURY

Defendant finally contends the trial court erred in preventing Christie from testifying to his opinion that Kleine exaggerated her back injury. Three prosecution witnesses testified that Kleine had some physical limitations arising out of problems with her back. Defendant himself admitted her back problems required pain medication. During cross-examination, Christie admitted knowing about Kleine's back surgery but the court would not allow Christie to say he believed Kleine exaggerated her back problems.

Evidence Code section 800 governs the admissibility of lay opinion. As the trial court observed, there was no showing that Christie had any basis for his opinion about Kleine's disability. Exclusion of the evidence was appropriate for lack of personal knowledge. (Evid. Code, § 702.) Furthermore, there was no factual foundation for Christie knowing how Kleine acted when she was with other people. The only other basis for his opinion was Kleine's character or character trait for exaggerating her disabilities. While opinion evidence is an admissible form of evidence to prove character (Evid. Code, § 1100), "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).)

Because there was no error or prejudice, Christie's opinion was properly excluded.

19

# VII

# DISPOSITION

None of defendant's claims of error have merit and there is no cumulative or prejudicial error.  (*People v. Hill* (1998) 17 Cal.4th 800, 844.)

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
       J.

We concur:

RAMIREZ
  P. J.

HOLLENHORST
    J.

20