Filed 10/16/13  P. v. Hagle CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE, | B246179 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA055488) |
| v. | |
| DANNY WAYNE HAGLE, JR., | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, David Walgren, Judge.  Affirmed.

George W. Taylor, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, and James William Bilderback II, Supervising Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury convicted defendant and appellant Danny Wayne Hagle, Jr., in count 1 of assault by means likely to cause great bodily injury against Jennifer Ligon (Pen. Code § 245, subd. (a)(4))[1] but found not true an allegation that defendant personally inflicted great bodily injury (§ 12022.7, subdivision (a)).  As to count 2, defendant was acquitted of the charge of battery with serious bodily injury (§ 243, subd. (d)) but found guilty of the lesser offense of battery (§ 242).

The trial court sentenced defendant to the middle term of three years in state prison as to count 1 and six months in county jail as to count 2.  The sentence on count 2 was stayed pursuant to section 654.

Defendant contends the trial court erred in admitting evidence of uncharged acts of domestic violence.  We affirm the judgment.

**FACTS**

*Prosecution*

Tammy Patterson had formerly been in a romantic relationship with defendant.  Early on the morning of February 11, 2012, Ligon drove Patterson to meet defendant.  Because defendant wanted to meet Patterson alone, Ligon dropped Patterson off outside a donut shop and stayed in her car so that defendant would not see her.  As soon as defendant saw Patterson, he began yelling at her.  He told Patterson he wanted to be in a relationship with her again.  Defendant began pacing back and forth, yelling, and gesturing aggressively.  He pointed his finger close to Patterson's face and raised his hand as if he intended to backhand her.  Patterson said that she wanted her belongings from defendant's apartment.  Defendant walked away, and Patterson followed him.  Ligon drove the car closer to them but did not get out.  Defendant saw Ligon and

---

[1]  All further statutory references are to the Penal Code unless otherwise stated.

approached the car. Defendant yelled at Ligon to "stay the fuck out of it" and called her names. She ignored defendant and looked straight ahead.

Defendant walked around the corner, with Patterson following him. Ligon got out of the car and followed them. Defendant turned around several times to yell at Patterson, calling her "slut," "toothless whore," and "bitch." Patterson began to walk away, but Ligon grabbed her by the arm and stopped her. Ligon told defendant she and Patterson would meet him at his place to get Patterson's things.

At that point, the women were standing next to each other on the sidewalk. Ligon was facing defendant, but Patterson was turned away from him. Defendant was about 50 feet away. He suddenly charged toward the women. Defendant looked angry and was clenching his fists and jaw. Ligon thought he was "going for [Patterson]," so she pushed Patterson out of the way. Patterson testified that defendant would have gotten to her if Ligon had not pushed her. Defendant could not reach Patterson and instead focused his attention on Ligon. He grabbed her and slammed her head into a telephone pole about three times. She sustained a gash over her eyebrow. When Ligon pushed back, defendant slammed her head into the pole again. She sustained two cuts about three inches long. Patterson jumped on defendant's back and hit him once on the head to stop him from hurting Ligon. Defendant broke free, jumped into the back of a nearby car, and was driven away.

Ligon testified that she went home, cleaned off the blood, and closed a wound on her forehead with two butterfly stitches. She experienced dizziness, nausea, diarrhea, and vomiting soon after the attack. She did not go to the hospital until 18 hours later, however, because she did not have anyone to watch her children.

At the hospital, Ligon was given a tetanus shot. It was too late to suture her wounds. Ligon told a nurse that her friend's boyfriend smashed her head into a telephone pole three times. Ligon suffered a minor concussion. Ligon was advised by the treating physician not to sleep more than two to four hours at a time for 48 hours and to follow up with her doctor over the weekend. Over time, Ligon continued to experience severe migraines, dizziness, blurry vision, tingling, numbness, and difficulty sleeping. Ligon

3

followed up with doctors, including a neurologist, about a dozen times. Police photographed Ligon's injuries approximately 24 hours after the attack.

Ligon signed an aftercare form indicating she did not suffer a concussion.

*Defense*

Patterson called defendant on the night of the incident, stating she wanted to meet him. They met, and while he was talking to Patterson, he noticed Ligon pulling up in a car about 15 feet away. Her window was rolled down. Defendant told Ligon he did not want to talk to her. Ligon got out of the car and began pushing defendant in the chest. Ligon cocked her fist back, so defendant pushed her. Defendant had been attacked by Ligon before and believed she would hit him, so he acted in self-defense. He did not ram Ligon's head into a telephone pole. The only physical contact defendant had with Ligon was the shove, which was hard and pushed her backwards. After he pushed Ligon, defendant saw some people coming toward him, so he ran.

On a prior occasion, defendant went to Ligon's apartment to see Patterson. Ligon came to the door, pushed him, and told him to get off her property. Defendant left, but Ligon followed him into the parking lot and punched him in the face several times.

Dr. Joseph Terrazino, a board certified doctor in physical medicine rehabilitation, testified there was no evidence Ligon was struck in the head three times, based on the information entered on her emergency room admittance form. A physical exam diagram of Ligon's head showed an abrasion, a small hematoma, and a laceration; however, a wound to the top of Ligon's head appeared healed, and there was no evidence she suffered a concussion. Based on her medical record, Dr. Terrazino concluded Ligon's injury was minor because no testing or CAT scan was performed, no blood was taken, Ligon's vitals were stable, and she was discharged without a period of observation.

4

Before trial, the prosecution sought to introduce evidence of uncharged acts of domestic violence by defendant against Patterson under Evidence Code section 1109. The trial court denied the request without prejudice, on the ground there was insufficient evidence for the court to determine whether the case involved domestic violence at that time.

Following Ligon's testimony, the prosecution renewed its request. The trial court admitted the evidence of prior uncharged acts of domestic violence. The court explained that "[Evidence Code section] 1109 comes into play in a criminal action [in] which the defendant is accused in an offense *involving* domestic violence," but it is *not* required that a particular penal code violation of domestic violence be alleged. The court was satisfied that the instant case involved domestic violence. The parties only came into contact because Patterson and defendant had previously cohabitated, Patterson wanted her belongings back, and Ligon knew of the prior acts of domestic violence and accompanied her friend, fearing for Patterson's safety. The court also cited to the evidence that defendant had called Patterson names and charged toward her with clenched fists and an angry look on his face. The probative value of the evidence substantially outweighed the prejudice to defendant. The court found the offenses "relatively minor . . . in the scheme of things" and noted the evidence would be presented by persons already testifying and would "not lengthen the trial to any noticeable degree." The defense again entered its objection under Evidence Code sections 1109 and 352.

Ligon personally witnessed an incident of domestic violence against Patterson, and Patterson testified to multiple prior uncharged incidents of domestic violence against her by defendant, as follows:

Defendant first hit Patterson in December 2011, when he learned she received a message from a male friend on Facebook. He hit her again a week later.

Another time when defendant and Patterson were arguing, he grabbed her arms, slammed her on the ground, and got on top of her. He stopped when Patterson called Ligon.

On January 19, 2012, defendant went to Ligon's house unexpectedly while Patterson was there. Ligon and Patterson were talking in the bedroom, and defendant called Patterson and told her to meet him outside. Ligon stayed in the room. When Patterson opened the door, defendant hit her across the face. He struck her a second time, and Patterson screamed, "Please don't hit me again." Ligon heard Patterson and went into the kitchen where she saw defendant slapping Patterson. Ligon told defendant to leave, but he refused. He said it was none of Ligon's business. Ligon pushed defendant out of the house and accidentally hit him in the face. Defendant screamed, yelled, and tried to get Patterson, but he couldn't get past Ligon.

In March 2012, defendant pushed a chair at Patterson causing her to fall down the porch steps. The chair fell on top of her. Patterson was pregnant with defendant's child at that time.

A few weeks later, defendant became upset regarding the case involving Ligon and pushed Patterson. Patterson fell and suffered an abrasion when her head hit the back of a bed.

In June 2012, defendant cornered Patterson in the kitchen and hit her. Patterson hit him back.

After the incident in June, Patterson left defendant for a few weeks but then wanted to resume their relationship. When she returned to defendant's apartment, he called her a "rat bitch" and tried to choke her. Patterson pushed defendant away. He shoved her into the bottom of a wood ottoman, which left a large bruise that went from her collarbone to the middle of her chest. Defendant poured a Red Bull energy drink on Patterson, pushed her into the bathtub, and ran the water. When she got up and pushed him, he grabbed her head and slammed it into a wall four times. Patterson's child witnessed the violence in the bathroom. Defendant warned Patterson that if she went to court, he would find her. He said he did not do anything wrong. Defendant pushed

6

Patterson from behind. She put out her hand to catch herself and it went through a glass pane on the door. Patterson was bruised and her wrist was scarred.[2]

Defendant contends the trial court erred in admitting prior uncharged acts of domestic violence against Patterson because he was not involved in a domestic relationship with Ligon and the charged crime did not involve domestic violence, as required under Evidence Code section 1109. He further asserts the uncharged acts were highly prejudicial under Evidence Code section 352, in violation of his state and federal rights to due process.

Preliminarily, we agree with defendant that the issue was preserved for appeal. As the Attorney General concedes, defense counsel objected to admission of the prior acts evidence at the hearing before trial and objected again when the prosecution moved to have the evidence admitted a second time during Ligon's testimony. It was not necessary for counsel to object a third time when Patterson testified. All evidence of prior uncharged acts of domestic violence had been discussed previously, and it was clear that defendant objected to admission of all testimony regarding the incidents. Defense counsel stated the evidence should be excluded because the case was "not a domestic violence prosecution," but rather a conflict between "two non-domestic persons" and therefore not relevant. The trial court had ample opportunity to sufficiently and properly evaluate the proffered evidence, in light of Evidence Code sections 1109 and 352, and did so. (See *People v. Williams* (1988) 44 Cal.3d 883, 906-907 ["The circumstances under which an objection is made should determine its sufficiency."].)

Regardless, defendant's contention fails. Evidence of prior uncharged acts of domestic violence is admissible in a domestic violence prosecution pursuant to Evidence Code section 1109, subdivision (a)(1): "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code

_____

[2] Patterson also identified photographs depicting injuries she suffered in this incident.

7

s]ection 1101 [precluding evidence of prior conduct to prove charged conduct] if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 1109, subdivision (a)(1) creates an exception in domestic violence cases to the rule that prior acts are inadmissible to prove a propensity to commit the charged crime. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233 (*Brown*); see *People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) "Even if the evidence is admissible under section 1109, the trial court must still determine, pursuant to [Evidence Code] section 352, whether the probative value of the evidence is substantially outweighed by the probability the evidence will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. [Citation.] The court enjoys broad discretion in making this determination, and the court's exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" (*Brown*, *supra*, at p. 1233, fn. omitted.)

We find no abuse of discretion. Evidence Code section 1109 does not include a list of offenses that involve domestic violence. Instead, the statute incorporates the definition of domestic violence in section 13700 (and, under certain circumstances, the broader definition in Fam. Code, § 6211). (Evid. Code, § 1109, subd. (d)(3).) Section 13700, subdivision (b) defines "domestic violence" as "abuse committed against an adult or a minor who is a . . . former cohabitant . . . or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." "'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (§ 13700, subd. (a).) Contrary to defendant's assertions, Evidence Code section 1109 does not prohibit admission of evidence of uncharged domestic violence offenses where the named victim of the charged crime is not in a current or former domestic or dating relationship with the accused. Moreover, the circumstances of a charged crime may establish it is an offense involving domestic violence, even if domestic violence is not an essential element of the crime. (See *Brown*,

8

*supra*, 192 Cal.App.4th at pp. 1232-1237 [murder]; *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1136-1139 [rape].)

Applying these definitions, the evidence at trial clearly established that defendant's crimes involved domestic violence. It is undisputed that defendant and Patterson cohabitated and had a dating relationship. Defendant intentionally or recklessly placed Patterson in reasonable apprehension of imminent serious bodily injury when he charged toward her. He was prevented from harming Patterson only because Ligon pushed Patterson out of the way, placing herself in defendant's path. Patterson met with defendant for reasons directly relating to their relationship—she wanted to retrieve her personal belongings from his apartment. Defendant expressed that he wanted the relationship to continue and was visibly angry about its dissolution. He used abusive language toward both Patterson and Ligon. Ligon was present only because she had previously witnessed defendant abusing Patterson and was afraid for Patterson's safety. Ligon knew defendant was volatile and initially attempted to stay out of view by remaining in her car. She would not have exited the car or been within range of defendant were it not that she knew he was a danger to her friend. Finally, it can be inferred that defendant harmed Ligon to place Patterson in apprehension of imminent serious bodily injury to Ligon as a way of controlling and intimidating Patterson.

With respect to relevance under Evidence Code 352, "'"'prejudice'. . . applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, 'prejudicial' is not synonymous with 'damaging.'"'" [Citation.] Relevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s)." (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.) Similarity to the charged offense is also a relevant consideration. (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.)

9

Here, both Patterson and Ligon testified that defendant battered Ligon. Defendant himself admitted to pushing Ligon very hard, which threw her backward. Defendant's expert witness attested that Ligon's medical records showed an abrasion, a small hematoma, and a laceration. Thus, defendant's prior acts of domestic violence against Patterson were highly probative as evidence that defendant was likely to attack Patterson again, and would not be deterred by Ligon's presence. Defendant was attempting to attack Patterson in a manner consistent with the previous attacks when Ligon intervened. Considering that defendant had not been charged with or punished for the prior acts, the nature of the violence was similar, the acts were very recent, and the primary target and motivation of the attacks were the same, the trial court could reasonably conclude that admission of the testimony was more probative than prejudicial.

Further, the jury was instructed pursuant to CALCRIM No. 852. As the Court of Appeal for the Third Appellate District has explained: "CALCRIM No. 852 explains that *if* the jury finds the defendant committed the uncharged acts, it *may* but is not required to conclude the defendant was disposed to or inclined to commit domestic violence and may also conclude that the defendant was likely to commit and did commit the crimes charged in [the present] case. . . . CALCRIM No. 852 clarifies that even if the jury concludes the defendant committed the uncharged acts, that evidence is only one factor to consider, along with all the other evidence and specifies that such evidence alone is insufficient to prove defendant's guilt on the charged offenses. CALCRIM No. 852 then goes on to state that the People must still prove each element of every charge beyond a reasonable doubt. In this, CALCRIM No. 852 . . . [includes] a clarification which inures to the defendant's benefit." (*People v. Reyes* (2008) 160 Cal.App.4th 246, 252.) With respect to an analogous instruction concerning prior sexual offense evidence, our Supreme Court has held: "This instruction [(CALJIC No. 2.50.01)] will help assure that the defendant will not be convicted of the charged offense merely because the evidence of his other offenses indicates he is a 'bad person' with a criminal disposition. [Citation.]" (*Falsetta*, *supra*, 21 Cal.4th at p. 920.) Given the state of the evidence and jury instructions, the trial court did not abuse its discretion in allowing the evidence of prior domestic violence.

10

Even if the trial court had abused its discretion, it is not reasonably probable the verdict would have been more favorable to defendant had the prior domestic violence evidence been excluded.  (Cal. Const., art. VI, § 13; *People v. Scott* (2011) 52 Cal.4th 452, 492.)  There was substantial evidence defendant assaulted and battered Ligon.  It is not reasonably probable the jury would have found defendant innocent had it not heard testimony about prior domestic violence.

Defendant contends admission of the prior domestic violence evidence under Evidence Code section 1109 violated his due process and fair trial rights under the United States Constitution.[3]  Having found no abuse of discretion, we also find no constitutional violation.  Moreover, the Courts of Appeal have uniformly held Evidence Code section 1109 does not offend due process.  (*People v. Johnson* (2010) 185 Cal.App.4th 520, 529.)

## DISPOSITION

The judgment is affirmed.


KRIEGLER, J.


We concur:



TURNER, P. J.                                    MOSK, J.

---

[3]  Regardless of whether defendant raised this argument in the trial court, it is cognizable on appeal.  (*People v. Moore* (2011) 51 Cal.4th 386, 407, fn. 6; *People v. Partida* (2005) 37 Cal.4th 428, 431, 434-436.)

11