Filed 5/26/16  P. v. Gonzalez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>IGNACIO GONZALEZ,<br><br>     Defendant and Appellant. | F069191<br><br>(Super. Ct. No. BF148558A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

On February 26, 2014, a jury found defendant Ignacio Gonzalez guilty on allegations he committed attempted murder (Pen. Code, §§ 667, 187, subd. (a), 189, count 1), aggravated mayhem (§ 205, count 2), assault with a firearm (§ 245, subd. (a)(2), count 3), residential burglary (§ 460, subd. (a), count 4), unlawful possession of ammunition (§ 30305, subd. (a)(1), count 5), and unlawful possession of a firearm (§ 29800, subd. (a)(1), count 6). The jury found true special allegations in counts 1 and 2 that defendant personally discharged a firearm in violation of section 12022.53, subdivision (d), a special allegation in count 3 that he personally inflicted great bodily injury in violation of section 12022.7, subdivision (c), and special allegations in counts 3 and 4 that he personally used a firearm in violation of section 12022.5, subdivision (a).

On April 1, 2014, the trial court sentenced defendant on count 1 to indeterminate sentences of life with the possibility of parole plus a consecutive term of 25 years to life for personally discharging a firearm. The court imposed a consecutive determinate sentence of three years on count 6 for felonious possession of a firearm. The court stayed the sentences on the remaining counts and special allegations pursuant to Penal Code section 654, including the first degree burglary conviction on count 4. Defendant received total custody credits of 366 days.

On appeal, defendant contends the trial court erred in permitting the prosecution to introduce evidence of uncharged misconduct, as well as expert testimony regarding the cycle of violence between intimate partners, and expert testimony on firearms. Defendant argues the trial court improperly limited defense counsel's cross-examination of an investigator's investigative techniques. Defendant further contends there was insufficient evidence to support his conviction for residential burglary, the trial court improperly instructed the jury on residential burglary, and there was cumulative error. Except for the allegation of instructional error on the burglary instruction, we reject these contentions.

**FACTS**

*Incident on May 18, 2013*

By the time of trial, A.C. and defendant had dated for over two years. A.C. said defendant was still her boyfriend, and they recently discussed getting married. A.C. said defendant was living with her at her residence on May 18.[1] On that date, the two went out to get pizza with A.C.'s two girls and started arguing. A.C. denied their voices were raised during the argument. Before they arrived back home, A.C. and her daughters exited defendant's pickup truck close to her house. Defendant told them to get back into the truck.

A.C.'s daughter Janice was 11 years old at the time of trial. Janice is one of five daughters of A.C. Janice testified defendant lived with her family for a while. Janice remembered the day in May when her mother got hurt and went to the hospital. Earlier that day, A.C., defendant, Janice, and another sister went to get pizza. Janice said A.C. and defendant were arguing. She did not remember them arguing before. During the argument, they got out of defendant's pickup truck close to their house. They started walking, but defendant did not want to leave them there and told them to get back into the truck. They got back into the truck and defendant dropped them off at their home.

Janice watched television while her mother and defendant argued outside the house. A.C. came back into the house and went to her room. Janice saw defendant get a gun from his truck and then come into the house through a window that Janice's older sister had opened for him. Janice was outside when defendant entered the house through the window. The sister told Janice to go inside the house. As Janice was entering the house, she heard a bedroom door slam shut and the sound of a gunshot.

When they arrived at A.C.'s home, A.C. explained she took defendant's keys to his truck and his cell phone and went inside the house. A.C. was trying to hide in the

---

[1]Unless otherwise designated, all date references are to the year 2013.

3.

closet of the master bedroom. She tried to hide the keys to the truck in the back of a dresser drawer. A.C. heard the door into her bedroom slam. A.C. was in the closet on her knees facing the wall. A.C. turned around and saw defendant holding a gun. A.C. explained that as the gun fell out of defendant's hands, she heard something drop and the gun went off. A.C.'s eyes were closed when something hit her face at her mouth, and she fell to the ground.

Defendant took A.C. outside to the front porch of her home. Kern County Sheriff's Deputy Karena Delagarza testified she was dispatched to the site of the shooting where she spoke to A.C.'s daughters, Janice and Jasmine. Janice, who was then 10 years old, appeared scared and was crying. Jasmine was 14 years old. Jasmine appeared afraid to Delagarza and explained her mother had run to her own vehicle and got in it after exiting defendant's truck. When defendant could not open the doors to A.C.'s vehicle, defendant told A.C., "'I want to shoot you.'"

Janice told Delagarza her mother and defendant were having an argument. Defendant accused A.C. of cheating on him and went into her home. Janice could hear the argument from the bedroom. She next heard a loud bang. Jasmine told Delagarza her mother and defendant were arguing outside when her mother went inside her own car and locked the car doors. Defendant could not get into the car and told A.C. he wanted to shoot her. A.C. went into her home and defendant followed her. Both children told Delagarza defendant told them to call the police and say it was an accident.

Investigators searching defendant's truck found a bag containing three unfired .45-caliber ACP bullets and one expended .45-caliber ACP shell. The ACP designation stands for Auto Colt Pistol, ammunition originally produced for the 1911 Colt pistol. There were four .410 shotgun shells; two of the shotgun shells had been cut down so they contained only the paper wad, powder, and primer. The handgun was found in the entryway to the house with a shell casing in the chamber. Investigators also found blood on the closet walls and a bullet next to a dresser that was in the closet.

4.

A.C. had surgery on her neck, which left scars on the front and back of her neck. Dr. Kevin Ciresi was the plastic surgeon who treated A.C.'s gunshot wound. The gunshot caused multiple fractures to her mandible. The fractures started from the lower lip area and went across the entire jawline at the gum line of the teeth from one lower incisor tooth to the other. The bullet had entered A.C.'s neck and exited her neck.

Before surgery, Dr. Ciresi had to make sure A.C.'s breathing airway was safe and intact. A.C. had swelling to her airway. Once the swelling was stabilized, Dr. Ciresi proceeded to operate on her mandible by making an incision across the base of the mandible and placing a reconstruction plate across the jawline. Dr. Ciresi prescribed A.C. medication for her pain and an antibiotic because A.C.'s wound became infected. Dr. Ciresi explained that although someone can be allergic to an antibiotic, an allergic reaction would not cause memory loss and neither would the pain medication.

*A.C.'s Pretrial Statements to Investigators*

Herman Caldas, an investigator with the Kern County District Attorney's Office, questioned A.C. about the shooting two months after it happened and again a few weeks prior to trial. The first questioning session was conducted on July 26.

Caldas explained A.C. asserted the shooting was an accident and a matter between her and defendant. As she continued to discuss the incident, however, A.C. admitted defendant was armed with a gun when he chased her into the bedroom and she tried to hide in the closet. Defendant then opened the door and pointed the gun at her. Caldas denied he threatened to send A.C. to jail or that he threatened to take A.C.'s children away from her.

Kern County Sheriff's Detective Kevin Kimmel also questioned A.C. twice, on June 27 and July 5. Both sessions were recorded and played for the jury. On June 27, A.C. said they had gone with two of A.C.'s daughters to get pizza. A.C. said defendant had been arguing with her and "saying stuff" to her on the day of the shooting. Defendant called A.C. a whore and told her she should reunite with her "baby daddy."

5.

A.C. told defendant they were not together, and she asked him to let her get out of his truck. She told her daughters to exit the truck and they began walking home.

Defendant told them he did not want them to walk home, so they reentered the truck. After arriving at A.C.'s home, defendant said he wanted to leave but A.C. took his car keys and his cell phone. After asking for A.C. to return his property, defendant and A.C. resumed their argument. A.C. was in her bedroom when the door to her room opened. A.C. did not remember defendant holding a gun, but she remembered getting shot while she was in the bedroom closet. While A.C. was in the hospital, defendant called her. She asked defendant why he shot her. Defendant replied he did not know. Although they had argued with each other in the past, they would separate at some point.

On July 5, A.C. told Kimmel she only recently had moved into the home where the incident took place and defendant was not living with her. The home belonged to A.C.'s ex-husband. A.C. explained she went into her bedroom closet. She heard the door to her bedroom close. Defendant was demanding his keys and other things. A.C. remembered crouching down at the time she was shot. She explained everything happened very quickly. A.C. said defendant had called her after the incident but she did not accept the call.

*Expert Testimony*

**Firearms**

Sergeant Sean Pratt of the Kern County Sheriff's Department was called to testify on behalf of the People as a firearms expert. Pratt was the range master for the Kern County Sheriff's Department and a sergeant for the bomb squad. As a range master, Pratt was responsible for all firearms training for the sheriff's department, maintenance of all firearms in service training and in qualifications. He had been a range master for a year and a half and had 23 years' training and experience with firearms. Pratt trains other officers in the use of handguns, shotguns, carbines, and submachine guns. Pratt is an

armorer, someone who is qualified by a gun manufacturer to perform inspections and repairs on firearms.

A voir dire by defense counsel was conducted in which Pratt admitted he was not an expert on firearms from 1937 but had fired defendant's gun from that era and conducted ballistics testing on it. Pratt further explained that in design, defendant's gun was similar to .38-caliber and .357-caliber guns. Defendant's gun was also very similar to the Smith & Wesson Model 19 that Pratt had carried when he started his police academy training. Pratt did not have specific training in the accidental firing of handguns from 1937. The trial court overruled defense counsel's objection to Pratt's qualification as an expert.

The gun used by defendant was a model 1917 Smith & Wesson double action revolver manufactured around 1937 in a World War I design. It uses .45-caliber ACP ammunition. Pratt researched the gun to familiarize himself with the specific characteristics of the gun. The gun can be fired in single-action fashion by cocking the hammer of the gun back by hand, or the operator can utilize a double-action feature by completely pulling the trigger of the gun. In single-action mode it took two or two and a half pounds of pressure to fire the gun. In double-action mode it took more than four and a half pounds of pressure to fire the gun. The lighter pull required the hammer of the gun to be cocked back by hand. The gun is equipped with a rebound slide, which is a safety feature preventing the gun from firing if dropped against a hard surface.

After inspecting the gun, Pratt found it in good working condition. With the hammer of the gun cocked back, Pratt slammed the gun against a wooden work bench—barrel forward—three or four times. The gun remained cocked in single-action mode. The hammer could not be pushed hard enough because the rebound slide prevented it from firing. In double-action mode, the rebound slide blocked the hammer from going forward at all unless the trigger was pulled. The test Pratt performed was to determine whether the gun could go off if it encountered force while it was in single-action mode.

7.

Pratt did not throw the gun to the ground, slam it on its side, slam it upside down, or slam it at an angle.

Pratt explained that simply dropping the gun would not cause it to fire absent the trigger being depressed by the operator or the trigger being hit by something as the gun fell. There was no possibility the hammer could be pulled back accidentally and then dropped accidentally while pulling the trigger. This is because pulling the hammer to the rear takes a good amount of force. To fire the gun in double action would require a significant amount of pressure to cock and load the spring and for the hammer to go forward and move the rebound slide out of the way. In double-action mode, an accident was very unlikely.

**Testimony on the Psychology of the Cycle of Violence**

Nada Yorke, a licensed clinical social worker and former probation officer, testified as an expert in intimate partner violence. Yorke explained intimate partner violence consists of a pattern of coercive and intimidating behavior designed to compel the victim into doing or not doing certain behaviors. The victims of such violence often report a cycle of violent acts, which is a buildup of tension in an intimate relationship, followed by an explosion phase and then a honeymoon phase. The pattern continues in this cyclical fashion. Some victims report they return to intimacy with their violent partner because they believe the violence will end; others state they return to a relationship out of fear or love and the desire to restore the relationship.

In criminal cases involving intimate partner violence, there is a consistent pattern of victims fearing loss of their partner if they pursue prosecution. This can lead to recantation of a report of violence. A victim may not wish to testify against the perpetrator of violence because he may be a father or a father figure to the victim's children, and the victim fears the children may blame the victim for any consequences to the perpetrator.

8.

Yorke conceded on cross-examination that the cycle of violence would not apply to a situation where the victim was never abused and the incident was an accident. Yorke explained she was there to "help the jury understand the dynamics of domestic violence … and intimate partner violence so that if, in fact, it is relevant to this case, then they have an additional piece of information with which to weigh the evidence."

*Defendant's Uncharged Misconduct*

Between 2003 and 2010, M.L. and defendant lived together and had three children. M.L. explained her relationship with defendant became physically violent at times because of defendant's jealousy. Although defendant tried to be a better person, his jealousy overpowered him. Defendant became upset if M.L. said hello to others because she was "his girl." Defendant would usually hit M.L. in the arms, but occasionally he would hit her in the face. When this happened, M.L. would bleed from her nose and her lips would swell.

One day in August 2006 while M.L. was shopping with defendant and her sister, who was pregnant, defendant became angry and hit M.L.'s sister in the face with a bottle he had thrown. After assaulting M.L., defendant would usually apologize to her, tell her he was sorry, and say he loved her. Defendant would promise not to hurt M.L. again and she would go back with him, but the same thing would happen "over and over." M.L. denied seeing defendant with a gun or hearing him threaten her with a gun. After defendant broke up with M.L., he began dating A.C., which upset M.L.

After defendant broke up with M.L., however, she got a restraining order against him because he would not stop bothering her. M.L. had to move to another town. Defendant would yell at M.L., demanding she come back to him. M.L. did not remember defendant saying he would kill her. Investigator Caldas questioned M.L. in 2013. M.L. told Caldas she got a restraining order on defendant because she knew he would kill her.

9.

## DISCUSSION

### I. Evidence of Uncharged Misconduct

#### A. Introduction

Defendant contends the trial court committed prejudicial error in permitting defendant's ex-girlfriend to testify about uncharged acts of domestic violence by defendant against her. Defendant argues the evidence of uncharged acts was inadmissible here because it had minimal probative value as there was not a larger scheme of dominance and control that escalated in frequency or severity; the victim was cooperative with the investigation; the primary issue was whether the shooting was intentional or accidental and M.L.'s testimony had no bearing on that point; and defendant's prior violence against M.L. was unduly prejudicial. We find the trial court understood its discretion and did not abuse it in allowing the introduction of this evidence.

#### B. Evidence Code Section 402 Hearing

During an in limine hearing concerning the admissibility of this evidence pursuant to Evidence Code[2] section 402, defense counsel objected to its introduction pursuant to section 352 because the victim of the uncharged misconduct was not the same person who was the victim in the instant action. Defense counsel was further concerned admission of M.L.'s testimony would reduce the prosecutor's burden of proof by showing defendant was currently dangerous because he had been so in the past. Defense counsel further objected to the evidence as violating his client's due process right to a fair trial and violating the spirit of section 1109.

The trial court overruled defense counsel's objections, noting the point in part of permitting evidence of past domestic violence in a proceeding was that the past conduct was uncharged. The court referenced Penal Code section 13700, which defines domestic

_____

[2]Undesignated statutory references are to the Evidence Code unless otherwise indicated.

10.

violence, and then observed that "clearly [section] 352 is the final stopgap to evaluate all of these." Defense counsel replied the case involved allegations of attempted murder, not domestic violence, and the elements of attempted murder were neither proved nor disproved by section 1109.

The trial court acknowledged defense counsel's argument, noted section 1109 was the law of California, and found that in determining the admissibility of evidence, there is always a balancing under section 352. The court found the proffered evidence admissible. Prior to M.L.'s testimony, defense counsel objected to her testimony as being improper character evidence violating his client's constitutional rights under the Fifth, Sixth, and Fourteenth Amendments. The court denied the objection, incorporating by reference its earlier comments during the section 402 hearing.

### C.     Analysis

Ordinarily, evidence of prior criminal acts is not admissible under section 1101 to show a defendant's disposition to commit such acts. The Legislature has created exceptions to this rule in cases involving sexual offenses (§ 1108) and domestic violence (§ 1109) because the policy considerations favoring exclusion of evidence of uncharged domestic violence crimes are outweighed in criminal violence cases by the policy considerations favoring admission of such evidence. In effect, section 1109 allows the admission of a defendant's other acts of domestic violence to show a propensity to commit such crimes. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232 (*Brown*).)

The admission of prior acts as propensity evidence encompasses charged and uncharged acts. Evidence of a prior act may even be introduced as propensity evidence where the defendant was acquitted of criminal charges based upon that act. (*Brown*, *supra*, 192 Cal.App.4th at p. 1233; *People v. Mullins* (2004) 119 Cal.App.4th 648, 652, 665-668.) Even if evidence is admissible under section 1109, the trial court must still weigh under section 352 whether the probative value of the evidence is substantially

11.

outweighed by the probability the evidence will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. The trial court has broad discretion in making this determination, and its exercise of discretion will not be disturbed on appeal except upon a showing the court acted in an arbitrary, capricious, or patently absurd manner resulting in a manifest miscarriage of justice. (*Brown*, *supra*, at p. 1233.)

As this court noted in *Brown*, section 1109 permits the admission of prior acts of domestic violence even if the charged offense did not involve prosecution for domestic violence. (*Brown*, *supra*, 192 Cal.App.4th at pp. 1233-1234.) *Brown* observed section 1109 does not contain an enumerated list of offenses defined as domestic violence, but noted subdivision (d)(3) incorporates by reference the definitions of domestic violence and abuse used in Penal Code section 13700 and Family Code section 6211. (*Brown*, *supra*, at p. 1234.)

Penal Code section 13700, subdivision (a) defines abuse as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." Domestic violence is defined in subdivision (b) of Penal Code section 13700 as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." (*Brown*, *supra*, 192 Cal.App.4th at p. 1234.)

In *Brown*, we agreed with the trial court's observation the murder victim had suffered the ultimate form of domestic violence, and the evidence of domestic violence in four prior abusive relationships was admissible under section 1109. (*Brown*, *supra*, 192 Cal.App.4th at pp. 1236-1237.) We concluded in *Brown* that a defendant's prior acts of domestic violence logically led to the inference of malice aforethought and culpability for murder. (*Id*. at p. 1237.)

Defendant argues the evidence of uncharged acts was inadmissible here because it had minimal probative value as there was not a larger scheme of dominance and control that escalated in frequency or severity; the victim was cooperative with the investigation; the primary issue was whether the shooting was intentional or accidental and M.L.'s testimony had no bearing on that point; and defendant's prior violence against M.L. was unduly prejudicial.

Defendant's first two arguments are that the evidence of uncharged acts had minimal probative value as there was not a larger scheme of dominance or control and the victim was cooperative with the investigation. The evidence adduced at trial does not support either of these arguments. A.C. was cooperative with investigators only to a degree. Soon after the shooting, A.C. permitted herself to be questioned by investigators. At trial, however, she apparently had reconciled with defendant and attempted to characterize the shooting as an accident. A.C. gave testimony at trial that defendant lived with her at the time of the shooting. This testimony conflicted with her earlier recorded statement to investigators that she had just moved into her new residence and defendant did not live with her. M.L.'s testimony put A.C.'s reconciliation with defendant in perspective and illuminated the inconsistencies in A.C.'s testimony with her prior recorded statements to investigators.

Defendant argues the primary issue was whether the shooting was intentional or accidental, and M.L.'s testimony had no bearing on that contention. We disagree. Defendant's primary defense was he dropped the gun and it accidentally discharged. A.C.'s 14-year-old daughter heard defendant tell A.C. he wanted to shoot her. Defendant's propensity to commit acts of abuse and domestic violence was directly relevant to his intent to shoot and kill A.C. In this regard, we find the facts in our opinion in *Brown* indistinguishable from those in this case and apply its holding here. We further agree with the People that evidence of defendant's domestic abuse of M.L. is admissible not only under section 1109, but under section 1101, subdivision (b) for the

13.

nonpropensity purpose of proving defendant's intent as well as to negate the defense the incident occurred accidentally. (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1143; *People v. McCray* (1997) 58 Cal.App.4th 159, 171-173.)

Defendant contends M.L.'s testimony concerning the uncharged acts of domestic violence was unduly prejudicial. The trial court, however, expressly considered whether the probative value of the evidence was outweighed by the prejudicial effect of its admission and concluded it was not, admitting the evidence pursuant to section 352. Defendant has failed to demonstrate the trial court abused its broad discretion in finding this evidence admissible.

Finally, defendant argues admission of this evidence violated his constitutional right to due process. Generally, issues relating to the admission of evidence do not raise a federal constitutional question. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; *Dowling v. United States* (1990) 493 U.S. 342, 352-354.) The California courts have also rejected due process challenges to the admission of domestic violence evidence, noting that due process is satisfied by reference in section 1109, subdivisions (a)(1), (a)(2), (a)(3), and (d)(3) to the trial court's application of section 352 in making its determination concerning whether acts of uncharged domestic violence are admissible. (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 [§ 352 saves companion statute § 1108 from due process challenge]; *People v. Lewis* (2009) 46 Cal.4th 1255, 1287-1289 [same]; *People v. Johnson* (2010) 185 Cal.App.4th 520, 528-530 [§ 1109 does not violate due process]; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704 [same].) We therefore reject defendant's due process challenge to section 1109.

## II.     Expert Testimony on Cycle of Violence

Defendant contends the trial court erred in permitting expert testimony concerning the cycle of violence experienced by victims in intimate partner relationships. Defendant

14.

argues there was no evidence of a cycle of violence or that A.C. recanted her initial allegations. These arguments are unpersuasive.

Evidence of domestic violence, or intimate partner battering, and its effects has been found admissible by the California Supreme Court pursuant to section 801.**3** (*People v. Brown* (2004) 33 Cal.4th 892; see § 1107.)

In *People v. Brown*, *supra*, 33 Cal.4th 892, only one incident of abuse occurred. Our Supreme Court held expert testimony concerning the behavior of domestic violence victims is admissible under section 801 because it assists the trier of fact in evaluating the credibility of the victim's trial testimony and earlier statements to police. The court also held this expert testimony provides relevant information about the tendency of victims of domestic violence to later recant or minimize their description of that violence. (*People v. Brown*, *supra*, at pp. 895-896.) When the trial testimony of an alleged victim of domestic violence is inconsistent with what the victim earlier told the police, the jurors may well assume the victim is an untruthful or unreliable witness. When the victim's trial testimony supports the defendant or minimizes the violence of the defendant's actions, the jurors may assume if there really had been abusive behavior, the victim would not be testifying in the defendant's favor. (*Id.* at p. 906.)

Defendant contends his case is distinguishable from *Brown* because *Brown* entailed a cycle of violence. Defendant argues there was an inadequate foundation for

---

**3**Section 801 states:

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:

"(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and

"(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

15.

the expert testimony because only a single violent act occurred. Defendant claims that unlike *Brown*, the evidence in his case did not establish he and A.C. were engaged in a cycle of violence.

Defendant misreads *Brown*. The Supreme Court did not conclusively determine the abuser and victim in that case were engaged in a cycle of violence. Rather, the court held there was an adequate foundation for expert testimony because the evidence at trial "suggested the possibility" the abuser and victim were engaged in a "'cycle of violence.'" (*People v. Brown*, *supra*, 33 Cal.4th at p. 907.)

Here, contrary to defendant's assertions on appeal, A.C. did not give consistent statements concerning defendant's actions. In her initial statement on June 26 to Caldas, A.C. described the incident as an accident, but admitted to Caldas she was chased by defendant who was carrying a gun, and she described crouching down in her bedroom closet attempting to hide from him. In her later recorded statement to investigators, A.C. again attempted to depict the shooting as an accident, but described hiding in her closet to avoid defendant. If defendant fired the gun accidentally, why would A.C. be chased by him as he was holding the gun and why would she try to hide from him? The facts as described by A.C. to Caldas and during the taped questioning sessions are inherently inconsistent with a simple accident.

At trial, A.C.'s account of the shooting was even more vague. In that account, A.C. merely said the gun somehow fired. Other expert testimony showed the gun could not accidentally discharge by being dropped; the trigger had to be intentionally pulled. A.C.'s daughter Jasmine also told investigators the day of the shooting that her mother tried to hide in her own vehicle from defendant and she heard defendant tell A.C. he wanted to shoot her.

The jury was entitled to an explanation for the victim's depiction of events in an inherently inconsistent manner, her willingness to minimize the gravity of the threat to her own life, and her apparent reconciliation with defendant by the time of trial. We

16.

reject defendant's attempt to distinguish the Supreme Court's *Brown* case and apply its holding here.

The admission of expert testimony is reviewed on appeal for an abuse of discretion. (*People v. Bolin* (1998) 18 Cal.4th 297, 321-322.) Nada Yorke's testimony explained the shift in A.C.'s accounts of what happened between her postshooting statements and her testimony at trial. Although defendant argues there was no cycle of violence, Yorke's testimony took this assertion into account. She explained it was for the jury to determine whether the cycle of violence had any applicability to this case. The court gave the jury a limiting instruction that Yorke's testimony on intimate partner battery was not evidence defendant committed any of the alleged offenses and could only be considered in deciding whether the victim's "conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of her testimony." The trial court did not abuse its discretion in allowing Nada Yorke to testify concerning the cycle of violence.

## III. Firearm Expert

Defendant contends the trial court erred in allowing Sergeant Pratt to testify as a firearms expert because defendant argues Pratt did not qualify as an expert. This was so, according to defendant, because Pratt himself said he was not an expert on firearms manufactured in 1937. There is no merit to this contention.

Section 720, subdivision (a) provides that one may testify as an expert if he or she has special knowledge, skill, experience, training, or education sufficient to qualify him or her as an expert on the subject to which his or her testimony relates. (*People v. Bolin*, *supra*, 18 Cal.4th at p. 322.) The trial court's determination of one's qualification as an expert is governed by the deferential abuse of discretion standard and will not be disturbed on appeal absent a showing of manifest abuse. Error regarding whether one is qualified to be an expert is found only if the evidence shows the witness clearly lacks

qualification as an expert. Complaints about the expert's qualifications that go only to the weight of the expert's testimony and not its admissibility do not constitute error. (*People v. Panah* (2005) 35 Cal.4th 395, 478; *People v. Bolin*, *supra*, at p. 322.)

The gravamen of defendant's contention is that Pratt himself admitted he was not an "expert" on guns manufactured in 1937. There is some ambiguity in Pratt's statement. Read in context, however, it appears Pratt was only conceding he did not have specialized expertise on the array of firearms produced in 1937. We do not interpret Pratt's statement to mean he was unqualified to testify concerning how defendant's gun operated or whether the gun's action could easily discharge accidentally. We find Pratt's statement unremarkable and do not find it to be evidence Pratt was unqualified to testify as a firearms expert.

Pratt's qualifications included 23 years of experience with firearms as a peace officer, serving as sergeant for the bomb squad, and serving as a range master for the sheriff's department for a year and a half. Pratt's first handgun while training to be a peace officer was a Smith & Wesson Model 19, a gun he explained as being very similar to defendant's gun. This point was important because Pratt's first handgun was little different from defendant's gun. Even without being an expert on guns manufactured in 1937, Pratt was nevertheless familiar with a firearm very much like defendant's handgun. He testified that defendant's gun was similar to .38- and .357-caliber handguns. Pratt trained other officers in the use of handguns, shotguns, carbines, and submachine guns. He was also an armorer who had special training from gun manufacturers and was responsible for the care and maintenance of firearms for the sheriff's department. Pratt extensively tested defendant's gun and determined it was very difficult to cause the gun to fire accidentally in single- or double-action mode.

Defendant's argument concerning Pratt's qualifications to testify as an expert goes to the weight of Pratt's testimony rather than to the admissibility of his testimony. There was substantial basis for the trial court to find Pratt was an expert on firearms and

18.

qualified as well to testify concerning the operational characteristics of defendant's gun. Defendant has failed to demonstrate the trial court manifestly abused its discretion or that Pratt was unqualified to testify as an expert on firearms.

## IV.     Limitation on Cross-examination of Investigator

Defendant contends the trial court erred in limiting cross-examination of Investigator Caldas concerning his investigative techniques in eliciting statements from witnesses by using untruthful statements during questioning. Defendant asserts he was not able to undermine Caldas's credibility during cross-examination. We reject this contention.

### A.     Trial Proceedings

After Caldas denied on cross-examination that he threatened A.C. with prosecution or to take away her children, defense counsel asked Caldas whether he previously lied to those he questioned or had testified under oath that he lies to suspects he questions. The trial court sustained the prosecutor's objection that the question was compound. Defense counsel asked Caldas whether part of his investigative technique is to lie to people he questions. Caldas replied, "No." Defense counsel then asked about a particular case involving an alleged child molester. The prosecutor objected. Outside the jury's presence, the court called a sidebar conference with counsel.

The court observed Caldas had just denied using deceit as a questioning technique. Defense counsel asserted he had trial transcripts from the other case where Caldas said he had used a ruse to get the suspect to make an admission. The court asked defense counsel to explain the relevance of using a ruse in another case if Caldas did not do so in this case. Defense counsel replied he should be allowed to test Caldas to show he was a liar. The court granted defense counsel's request to conduct a section 402 hearing.

Caldas was asked whether there were ever situations in which he used ruses or false information in order to get the person being questioned to speak truthfully. Caldas

replied, "Only on suspects; not on witnesses." Caldas said it was his testimony that he did not use ruses or false information when questioning witnesses. Caldas did not see a need to use a ruse on the victim of a crime. The trial court ruled it would not permit defense counsel to cross-examine Caldas concerning the use of ruses or other false information unless in this case he broke with his regular practice of not using these techniques when questioning witnesses.

### B.      Analysis

The right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility. Trial judges retain wide latitude as to the imposition of reasonable limits on cross-examination pursuant to the confrontation clause. A trial court's limitation on cross-examination of an adverse witness does not violate the confrontation clause of the federal constitution unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679-680; *People v. Quartermain* (1997) 16 Cal.4th 600, 623-624.) The trial court has wide discretion in controlling the scope of relevant cross-examination. (*People v. Farnam* (2002) 28 Cal.4th 107, 187.)

Defendant's attempt to cast the trial court's limitation on defense counsel's questioning of Caldas as a violation of defendant's right to cross-examination is unpersuasive. The trial court conducted a full section 402 hearing to determine whether Caldas had lied or used a ruse while questioning a witness. Defense counsel represented he had a trial transcript in which Caldas had admitted using a ruse in another criminal case. During the evidentiary hearing, however, Caldas elaborated he never used a ruse or other deceitful questioning technique on a witness. He admitted doing so only when questioning a suspect in a criminal case. A.C. was not a suspect in any criminal action. She was the victim and witness of the crimes.

Had defense counsel been permitted to question Caldas concerning an unrelated criminal case, it would have caused undue consumption of time and confused or misled the jury. (See *People v. Avila* (2006) 38 Cal.4th 491, 578.) Caldas explained the important distinction in questioning witnesses to crimes and the suspects who perpetrated crimes. Had the jury heard this important distinction in how Caldas questioned witnesses, it is improbable Caldas's credibility as a witness in this case would have come into question based on how Caldas treated a criminal suspect in an unrelated case. The potential for the undue consumption of time and confusion to the jury was far greater than the probative value of the evidence defense counsel wanted to use to impeach Caldas. The trial court did not abuse its discretion in limiting defense counsel's cross-examination of Investigator Caldas.

## V.     Burglary Conviction

Defendant contends there was insufficient evidence to support his conviction for burglary. Defendant further contends his conviction for burglary must be reversed because the jury was not instructed to evaluate whether defendant had a possessory interest in A.C.'s residence. If defendant had such an interest, he argues he could not be convicted of burglary. We find there was substantial evidence to support defendant's conviction for burglary. We further find, however, this evidence was conflicting and the jury was not adequately instructed on the issue of whether defendant had a possessory interest in the property. Accordingly, we will reverse defendant's burglary conviction and remand for further proceedings should the People elect to pursue this allegation.

### A.     Substantial Evidence of Burglary

In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable

doubt.  The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  It is the jury, not the appellate court, which must be convinced of a defendant's guilt beyond a reasonable doubt.  If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

In reviewing a challenge to the sufficiency of the evidence, appellate courts do not determine the facts.  We examine the record as a whole in the light most favorable to the judgment and presume the existence of every fact the trier of fact could reasonably deduce from the evidence in support of the judgment.  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151; *People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  Unless the testimony of a single witness is physically impossible or inherently improbable, it is sufficient for a conviction.  (§ 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

An appellate court must accept logical inferences the jury might have drawn from circumstantial evidence.  (*People v. Maury* (2003) 30 Cal.4th 342, 396.)  Before setting aside the judgment of the trial court for insufficiency of the evidence, it must clearly appear there was no hypothesis whatever upon which there was substantial evidence to support the verdict.  (*People v. Conners* (2008) 168 Cal.App.4th 443, 453; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

A person who enters a house or building with the intent to commit a felony is guilty of burglary.  A person who enters for a felonious intent may be found guilty of burglary even if the person enters with the owner's consent.  (*People v. Frye* (1998) 18 Cal.4th 894, 954, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Gauze* (1975) 15 Cal.3d 709, 714-717 [defendant was tenant

22.

of apartment he entered and had unqualified possessory interest in that property].) One may be convicted of burglary if he or she enters with consent, provided he or she does not have an unconditional possessory right to enter the building. (*People v. Pendleton* (1979) 25 Cal.3d 371, 382.)

In *People v. Davenport* (1990) 219 Cal.App.3d 885, 889-890 (*Davenport*), this court was presented with the question of whether a spouse with a possessory interest in a home he used to live in could burglarize it. In *Davenport*, a husband and wife lived upstairs in a home owned by the wife's parents. When the husband separated from the wife, he moved out and lived elsewhere but still stored property in the home. Later, the wife informed the husband she had boxed his belongings and left them upstairs so he would have no reason to enter the downstairs of the home. The wife insisted on being present when the husband came to retrieve his things. The husband, assisted by a friend, took possession of his property in late August, but the wife refused him entry to the downstairs area and directed him to where his property was located on the second floor. (*Id*. at pp. 887-888.) In early September, while the wife was away, the husband and a friend broke into the residence through windows on both floors and ransacked the property. (*Id.* at pp. 888-889.)

In *Davenport*, the defendant-husband asserted he had a possessory interest in his wife's residence, relying on former Civil Code section 5102, subdivision (a) (now Fam. Code, § 753), which stated neither spouse can be excluded from the other's dwelling. (*Davenport*, *supra*, 219 Cal.App.3d at pp. 889-890.) This court rejected defendant's argument and his further contention he was entitled to a burglary instruction on his right to enter his wife's home, reasoning in part that the defendant either had no right to enter the residence on the second occasion, or any right the defendant had to enter was conditional, and his right to enter pursuant to the Civil Code was qualified to a lawful purpose. (*Davenport*, at pp. 890-892.)

23.

In *People v. Ulloa* (2009) 180 Cal.App.4th 601, 604-605 (*Ulloa*), there was a similar factual scenario to *Davenport*. A husband and wife were separated, going through a divorce, and had shared an apartment together prior to the husband moving out. The defendant-husband was later convicted of burglarizing the wife's apartment and stealing her purse and $900 from her wallet. (*Ulloa*, *supra*, at pp. 606-607.) The defendant was a signatory along with his wife to the lease on the apartment. (*Id*. at pp. 606-609.) After acknowledging *Davenport* was factually distinguishable because the property there was owned by the wife's parents, the court in *Ulloa* found whatever legal interest the defendant had in the apartment, his possessory interest was conditional because he abandoned his unconditional possessory interest by moving out. (*Ulloa*, *supra*, at p. 609.) The court in *Ulloa* concluded there was substantial evidence before the jury that the spouses were separated and estranged from each other and the defendant had moved out of the apartment, leaving him with only a conditional possessory interest in the apartment. The lease, therefore, did not constitute a complete defense to burglary, and the trial court did not err in denying the defendant's motion for acquittal under Penal Code section 1118.1. (*Ulloa*, at pp. 606, 610.)

There was evidence adduced at trial that defendant did not live with A.C. at the time of the shooting. Prior to trial, A.C. told investigators she had just moved into her new residence and defendant did not live with her. Also, there was evidence defendant had to enter the house through a window. At trial, however, A.C. and her daughter testified defendant lived with them. Also, A.C. had the keys to defendant's truck. The record is unclear concerning whether defendant's house keys were also with his truck keys.

We conclude there was substantial evidence to convict defendant of burglary. This evidence, however, was conflicting. This brings us to defendant's related and further contention that the jury was not instructed on whether defendant could burglarize a home in which he potentially had a possessory interest.

24.

## B. Burglary Instruction

The jury was instructed with CALCRIM Nos. 1700, setting forth the general burglary instructions, and 1701, defining the distinction between first and second degree burglary and stating the People had the burden to prove first degree burglary beyond a reasonable doubt. The instruction germane to our analysis is CALCRIM No. 1700, which was given to the jury as follows:

"The defendant is charged in Count 4 with burglary. To prove that the defendant is guilty of this crime, the People must prove that:

"One, the defendant entered a building.

"And, two, when he entered a building, he intended to commit attempted murder and/or mayhem and/or assault with a firearm or a lesser included felony offense.

"To decide whether the defendant intended to commit attempted murder and/or mayhem and/or assault with a firearm, or a lesser included felony offense, please refer to the separate instructions that I have given or will give you as to those crimes or allegations.

"A burglary was committed if the defendant entered with the intent to commit one of the crimes or [the] lesser included felony offenses as set forth above.

"The defendant does not need to have actually committed one of the crimes or the lesser included felony offenses as set forth above as long as he entered with the intent to do so.

"The People do not have to prove that the defendant actually committed one of the crimes or lesser included felony offenses as set forth above. Under the law of burglary, a person enters a building if some part of his or her body or some object under his or her control penetrates the area inside the building's outer boundary.

"A building's outer boundary includes the area inside a window screen.

"The People allege that the defendant intended to commit one of the crimes or lesser included felony offenses as set forth above.

25.

"You may not find the defendant guilty of burglary unless you all agree that he intended to commit one of those crimes at the time of entry. You do not all have to agree on which of those crimes he intended."

As the California Supreme Court explained in *People v. Gauze*, *supra*, 15 Cal.3d 709, burglary is an entry invading a possessory right in the building, and it must be committed by one who has no right to be in the building. A defendant, therefore, cannot burglarize his or her own home. (*Id*. at pp. 712, 714.) This rule applies to sole owners of homes was well as to joint occupants. (*Id*. at p. 712.) As in the common law, a burglary under Penal Code section 459 "still must be committed by a person who has no right to be in the building." (*Gauze*, at p. 714.)

A court has a sua sponte duty to instruct on general principles of law that are closely and openly connected to the facts presented at trial. (*People v. Ervin* (2000) 22 Cal.4th 48, 90.) The trial court is charged with instructing upon every theory of the case supported by substantial evidence, including defenses not inconsistent with the defendant's theory of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.)

No instruction to the jury explained defendant could not burglarize his own home as long as he had an unconditional possessory right to enter the property. Although there was conflicting evidence on this point, there was evidence to support the fact defendant lived in A.C.'s residence unconditionally. The jury was not instructed on this point. Exacerbating the absence of an instruction on defendant's potential possessory interest to be on the property was the pattern instruction in CALCRIM No. 1700 informing the jury the People only had to prove defendant entered the building and did so with the intent to commit one of the charged felonies or a lesser included felony of those charged. The absence of an instruction on having a possessory interest in the property, coupled with the pattern instruction, had the effect of reducing the People's burden of proof under the facts of this case.

The People argued defendant did not rely on this defense, and the evidence showing defendant did not live in the house was so overwhelming any error was

harmless.  In his closing argument to the jury, however, defense counsel stated there was no credible evidence of a residential burglary, and both A.C. and her daughter had testified defendant lived in the house.  Defense counsel described the burglary allegation as a "pile-on charge" because defendant lived in the house.[4]  Later in closing argument, defense counsel again challenged the residential burglary allegation as subject to reasonable doubt because there was conflicting evidence whether or not defendant lived with A.C.  As we discussed above, the evidence in this case was close and conflicting on the point of whether defendant lived in A.C.'s house.  It was not "overwhelming" as the People characterize it.

We conclude the trial court erred in failing to instruct the jury on a defense to the crime of burglary supported in the record by substantial evidence.  The jury had no means from the instructions given by the trial court to evaluate whether defendant had an unconditional possessory interest in the residence.  Accordingly, defendant's burglary conviction in count 4 is reversed.  Because there was substantial evidence to support defendant's conviction for burglary, however, the People may elect to retry defendant on this count.

## VI.    Cumulative Error

Because the only error involved the burglary allegation in count 4, defendant has failed to demonstrate cumulative error or that he did not receive a fair trial on the other allegations.  (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1056.)

### DISPOSITION

Defendant's conviction for burglary as alleged in count 4 is reversed.  The case is remanded to the trial court.  Should the People elect to retry defendant on the burglary allegation, they must refile the charges within 45 days after this court issues the remittitur

---

[4]Furthermore, during discussions concerning instructions defense counsel acknowledged there was conflicting evidence concerning whether defendant lived in the house, and he requested an instruction on trespass.  The trial court refused the trespass instruction.

to the trial court.  Should the People not refile the burglary charge within 45 days, the trial court shall dismiss the burglary conviction and prepare an amended abstract of judgment, removing defendant's burglary conviction, and forward it to the appropriate authorities.  The judgment is otherwise affirmed.

_____

PEÑA, J.

WE CONCUR:


_____

GOMES, Acting P.J.


_____

SMITH, J.