Filed 8/2/16  P. v. Franks CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TOM MARK FRANKS,<br><br>Defendant and Appellant. | F070660<br><br>(Super. Ct. No. 1444611)<br><br>**OPINION** |

THE COURT*

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ricardo Cordova, Judge.

Gideon Margolis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Eric L. Christoffersen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*       Before Levy, Acting P.J., Kane, J. and Poochigian, J.

## INTRODUCTION

A jury found appellant Tom Mark Franks not guilty of second degree murder for the death of Jacqueline Millan, but instead found him guilty of voluntary manslaughter (Pen. Code, § 192, subd. (a); count I). It was found true he personally and intentionally discharged a firearm (Pen. Code, § 12022.53, subd. (d)). Appellant admitted a bail enhancement allegation and prior felony conviction allegations. He was sentenced to an aggregate prison term of 39 years.[1] Various fees and fines were imposed.

On appeal, appellant contends the trial court abused its discretion in admitting evidence of his prior acts of domestic violence. We find no abuse of discretion and no prejudice even when we presume error occurred. We affirm.

## FACTUAL BACKGROUND

### I.    Relevant trial facts.

#### A.    The shooting.

On May 4, 2012, Jacqueline (Dotty) Millan was shot in her head. The shooting occurred near a house on Vernon Avenue in Modesto which Jacqueline was renovating with appellant. There was no evidence of gun powder around Jacqueline's wound, indicating it was not a close-range shot. There was no exit wound. The bullet wound was approximately one centimeter in size. The bullet struck her skull and shattered into several pieces, making it impossible to determine its caliber. Based on the size of the entry wound, a deputy believed a small handgun could have been used to shoot her. She was declared brain dead on May 7, 2012.

#### B.    The neighbor's testimony.

Floriberto Aguilar saw Jacqueline in the early evening of the shooting. She was walking towards the Vernon house, which was two houses from his residence. Aguilar

---

[1]    Appellant was concurrently sentenced and received additional time from a companion case which is not part of this appeal.

went inside his residence and opened a window. He could hear Jacqueline arguing with appellant, recognizing their voices from past encounters. Jacqueline was accusing appellant of cheating on her. Aguilar knew appellant was Jacqueline's boyfriend. The arguing lasted 20 or 30 minutes. He called 911 when it intensified.

After calling authorities, Aguilar poked his head out his window. It was dark outside. He saw Jacqueline's silhouette as she stood outside, and he did not see anyone else. He pulled his head back inside and continued to hear Jacqueline arguing with appellant. After some time, appellant was quiet for three to five minutes. At some point Aguilar saw a "tall, skinny male" run out of a nearby alley. This person turned and ran down the street in Jacqueline's general direction. Aguilar did not believe the skinny male was appellant. Aguilar then heard three shots and sounds of someone running away. He described the shots as if coming from "a little toy cap gun" which made a "popping noise." Aguilar called 911 again and reported the shots fired. He looked out his window and saw two vehicles parked in the street. Aguilar could see a man was in one of the vehicles. Aguilar exited his house and found Jacqueline lying on the ground, severely injured but still conscious.

### C.     Appellant's initial statements.

Sheriff's deputies arrived at the shooting scene at approximately 10:00 p.m. and conducted a search of the area. Later that night, deputies established a perimeter around the Vernon house. Following commands from deputies, appellant exited the rear of that house. He was taken into custody and transported to a sheriff's station. Sometime after 11:25 p.m. that night, a deputy administered a gunshot residue test on appellant's hands, which was negative. The lack of gunshot residue either indicated appellant did not fire a gun, he fired a gun but no particles were deposited on the areas which were sampled for testing, he fired a gun and no residue was left on his hands, or any deposited residue was removed by the time the samples were collected.

3.

Deputies conducted a general search around the crime scene, and searched the Vernon residence and a neighboring storage shed. No gun or ammunition was located. No spent shell casings were located. In the shed, a gun holster was located, which appeared very worn. The holster was designed to hold a compact-sized gun, possibly having a two- or three-inch barrel. Deputies were unable to search a burned-out detached garage located at the Vernon house due to its structural unsoundness. Deputies also did not search two septic tanks on the property which were not sealed but were covered with plywood. Based on the covering, a deputy opined at trial that someone could have tossed something into a septic tank.

At the sheriff's office, appellant told deputies he had been sleeping in the Vernon house when the shooting occurred. He said he had been at Jacqueline's residence earlier in the evening, identifying himself as her "off and on" boyfriend of 27 years, and her live-in boyfriend over the last year. He denied arguing with Jacqueline that night and said he was asleep when any arguing occurred. He said he was oblivious to what happened outside. He claimed to have not heard any of the shots, sirens or noises. Appellant then said he had an earlier argument with Jacqueline that day at another location, and he had been drinking earlier. He claimed to have gone to the Vernon house alone and passed out from too much alcohol.

When shown the gun holster from the shed, appellant said he did not know anything about it and claimed somebody was setting him up. He later admitted that everything in the shed belonged to him. He opined it was Steve Millan, Jacqueline's estranged husband, who hurt Jacqueline. Appellant was confronted with Aguilar's statements that appellant was heard arguing with Jacqueline before the shots. Appellant continued to deny having any argument with her outside the Vernon house. He showed very little emotion upon hearing that Jacqueline was not doing well and would probably not live.

4.

### D. Appellant changes his story.

Several days later, after being placed into jail, appellant asked to speak again with a deputy. In the subsequent interview, appellant changed his story regarding the night of the shooting. He said he returned to the Vernon house and Jacqueline arrived shortly thereafter, banging on the door. She accused him of having an affair and cheating on her. The argument escalated and became physical. He said Jacqueline swung at him on the front porch. He gave her a bear hug and they moved to the front yard. He said "all of a sudden a gun comes out of nowhere." He had no idea where the gun came from. A single shot occurred. He let go of Jacqueline, walked back inside the Vernon house and fell asleep. He said he did not check on Jacqueline's well-being because he was in shock, blacked out, and did not know what happened. When asked why he lied during his first interview, appellant said he did not know, he was in shock, and he did not know what occurred.

### E. Evidence of appellant's prior acts committed against Jacqueline.

The son of Steve and Jacqueline, Aaron Millan, told the jury that appellant and Jacqueline argued a lot. Aaron recalled a fishing trip during which appellant and Jacqueline got into an argument, and appellant pushed her. Police were called and she complained about her chest hurting.

On another day in April 2012, appellant and Jacqueline had an argument and he tried to set fire to an attic of a house they were renovating. Appellant lit newspaper and began to climb a ladder to the attic. Aaron knocked the newspaper from appellant's hand, and the argument continued. Appellant left the area. Jacqueline complained of chest pain and she showed Aaron a handprint on her chest, which Aaron photographed. Later that night, appellant went to Jacqueline's residence and began yelling outside. Appellant held a brick in his hand, which he threw at Jacqueline's front door, causing some damage.

On another day, Aaron witnessed appellant burning a pile of clothes in their backyard. Aaron also knew the garage at the Vernon house caught on fire when Aaron and Jacqueline were not there.

April Rodrigues, a friend of Jacqueline, recalled an incident when appellant and Jacqueline got into an argument. Appellant started swinging at Jacqueline, who swung back. Rodrigues described him as "going nutty" and he hit and kicked at Jacqueline. Appellant said he was going to kill Jacqueline, called her a stupid bitch, and told Rodrigues to get out of the way or he would hit her. Appellant left before police arrived.

### F. Arson investigation.

On April 8, 2012, fire captain and arson investigator Alfonso Zamora investigated a fire to the garage at 1605 Vernon Avenue in Modesto. He determined arson was the cause. He interviewed Jacqueline at her residence. Zamora saw articles of burnt clothing in the driveway. Zamora also interviewed appellant, who said Jacqueline burnt the clothes because she was mad at him for cheating on her. Appellant denied any knowledge of the garage fire at the Vernon house and denied starting it. Appellant, however, admitted to Zamora that the night before the garage fire occurred, appellant had lit a piece of paper on fire, but denied trying to burn anything down.

### G. Steve Millan's whereabouts during the shooting.

Aaron testified he was home with Jacqueline on the day she was shot. Aaron testified that his father, Steve, was not home that day and had not been home for a while.

Steve testified he and Jacqueline had been married for 13 years but they were separated. Steve believed Jacqueline knew their relationship was over. He denied ever being violent towards her, and said he does not own a gun. He worked as a long-haul truck driver and was not home for long periods of time. He testified he had been away for approximately three months when the shooting occurred. He was off-duty from work from April 30 through May 4, 2012. On the day of the shooting, he testified he was in

Ontario, California, staying in his truck. Evidence was introduced at trial showing he made a cash transaction in Ontario, California on the day of Jacqueline's shooting.

Steve became aware of appellant approximately eight months before Jacqueline's death. Steve knew Jacqueline was having an affair with appellant. In December, before the shooting, Steve spoke with appellant on the telephone. Appellant threatened to blow up Steve's truck, burn down Steve's house, and "torch the cars."

## DISCUSSION

**I.     The Trial Court Did Not Abuse Its Discretion And Any Presumed Error Is Harmless.**

Appellant argues the trial court abused its discretion in admitting evidence of his prior acts of domestic violence against Jacqueline. He contends reversal is required.

**A.     Background.**

**1.     The trial court's ruling.**

Prior to trial, the prosecution sought leave to introduce evidence of appellant's prior acts of domestic violence pursuant to Evidence Code[2] section 1109. Specifically, the prosecutor wanted to introduce the following incidents: (1) on April 7, 2012, appellant arrived drunk at the house on 1605 Vernon Avenue, he threatened to burn down the house, attempted to throw a burning newspaper into the attic, and he slapped Jacqueline across the chest. When Jacqueline and Aaron returned to their home, appellant threw a brick at the house, causing damage; (2) in Rodrigues's presence, on April 8, 2012, appellant confronted Jacqueline at the 1605 Vernon Avenue house. He struck her five times, knocking her to the ground; and (3) on the same day, April 8, 2012, the garage at 1605 Vernon Avenue was burned down and appellant was seen leaving the area.

---

**2**     All further statutory references are to the Evidence Code unless otherwise specified.

At the hearing on the motion, the prosecutor said it was probable that three or four witnesses would testify about these prior acts, two of whom would testify on other trial issues. It was believed this testimony would take less than half a day. Defense counsel conceded these three prior instances were proper under section 1109, but argued these acts should be excluded under section 352. The defense asserted the evidence of appellant's guilt was relatively weak, making these acts more prejudicial than probative because the jury could conclude appellant was a bad guy.

The court determined a relatively insignificant amount of time would be consumed by this proposed evidence, and it was proper based on allegations of prior domestic violence. The court ruled this evidence was admissible.

### 2. Relevant closing arguments.

During closing arguments, the prosecutor's initial summation focused on the evidence pointing to appellant as the shooter. Aguilar heard appellant arguing with Jacqueline close to the time of the shooting. Appellant had time to throw his gun away, either placing it in the burned-out garage or tossing it down the septic tank. The prosecutor summarized the past acts of violence which appellant committed upon Jacqueline. The prosecutor asked the jury to find appellant's final statement to the deputy as unreasonable and lies. Jacqueline's wound was from a small caliber gun and deputies located the holster. The prosecutor finished her comments by urging the jury to find appellant guilty of murder, asking them to look at all of the evidence, "including the lies and where he was and the argument immediately before, and his propensity to commit domestic violence as one factor including all of those factors to find him guilty."

### B. Standard of review.

"We review a challenge to a trial court's choice to admit or exclude evidence under [Evidence Code] section 352 for abuse of discretion. [Citation.]" (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.) We will reverse only if the court's ruling was

8.

" 'arbitrary, whimsical, or capricious as a matter of law. [Citation.]' [Citation.]" (*Id.* at p. 292.)

### C.    Analysis.

Appellant asserts the disputed evidence was not highly relevant regarding the identity of Jacqueline's shooter. He contends the prior acts were not similar to the murder and did not readily permit an inference that the same person shot Jacqueline. In contrast, he argues the prejudicial effect of these acts substantially outweighed its probative value. He maintains the jurors could have had a strong emotional bias created from this evidence, perhaps believing he was an arsonist, and there was a considerable likelihood the jury could confuse the uncharged acts from the charged crime. He submits the trial court abused its discretion when the legal principles are examined compared to the reasonableness of the trial court's decision. We disagree.

### 1.    The trial court did not abuse its discretion.

In general, character evidence is inadmissible to prove a person's conduct on a specific occasion. (§ 1101, subd. (a).) However, evidence a defendant committed a prior crime or other bad act may be admissible if relevant to prove another fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. (§ 1101, subd. (b).) Moreover, when a defendant is charged with an offense involving domestic violence, "evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (§ 1109, subd. (a)(1).) Section 1109 effectively " 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]' [Citations.]" (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233.)

Section 352 grants a trial court with discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue

prejudice, of confusing the issues, or of misleading the jury." (§ 352.) Under section 352, "the probative value of the evidence must be balanced against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses. [Citation.]" (*People v. Branch, supra,* 91 Cal.App.4th at p. 282.)

We are unpersuaded by appellant's argument that his past acts of domestic violence were not relevant because they were dissimilar to the final act of murder. As evidenced by the legislative history of section 1109, propensity evidence is permissible in cases involving charges of domestic violence because domestic violence involves a scheme of dominance, control and ongoing abuse. (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419.) Without evidence of past domestic violence, the escalating nature of that crime is otherwise masked. (*Ibid.*) It has been recognized that "murder is 'the ultimate form of domestic violence[.]' " (*People v. Brown, supra*, 192 Cal.App.4th at p. 1237.)

Here, appellant's prior acts had some probative value to show his ongoing motivation and intent to both threaten Jacqueline, including a past threat to kill her, and to physically harm her. Appellant's past actions demonstrate a pattern of dominance and control over Jacqueline.

This evidence was not unduly inflammatory. There was no possibility the jury would confuse the prior incidents with the charged allegation of murder because the past acts occurred at different times and involved different circumstances. The prior acts were relatively mild compared with the murder charge. The presentation of this evidence did not consume a lengthy amount of trial time. When comparing the legal principles with the reasonableness of the trial court's decision, we cannot say that the trial court abused its discretion.

## 2. Any presumed error was harmless.

When evidence is erroneously admitted regarding a defendant's prior bad acts, the issue is whether it is reasonably probable a result more favorable to the defendant would have been reached without the error. (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1145.)

Here, Aguilar heard appellant arguing with Jacqueline before her murder. The argument became so intense Aguilar called 911. Jacqueline's gunshot wound was small and likely caused by a small caliber gun. Although law enforcement never located a gun, they recovered a worn holster in appellant's shed which previously held a small gun. Appellant initially told interviewing deputies he slept through the events that night, he did not argue with Jacqueline at the Vernon house, and knew nothing of Jacqueline's shooting. Several days later, however, he dramatically changed his story and said he argued with Jacqueline at the Vernon house, they were on the lawn, a gun suddenly appeared, and she was shot. He claimed to have returned inside without checking on her condition and fell asleep.

Although the prosecutor mentioned the prior acts as one factor showing appellant's guilt, those prior acts did not dominate the prosecution's case or closing arguments. Appellant's statements lacked any credibility regarding his involvement in Jacqueline's death. It is not reasonably probable a result more favorable to appellant would have occurred had evidence of his prior acts not been admitted. Any presumed error was harmless. Accordingly, appellant's conviction will not be reversed.

## DISPOSITION

The judgment is affirmed.

11.